Steven Wade MILLER *v.* STATE of Arkansas

CR 96-892 942 S.W.2d 825

Supreme Court of Arkansas
Opinion delivered April 14, 1997
[Petition for rehearing denied May 19, 1997.]

*Q. Byrum Hurst, Jr.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *C. Joseph Cordi, Jr.*, Asst. Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Steven Wade Miller appeals the judgment of conviction of the Columbia County Circuit Court convicting him of capital murder and sentencing him to life imprisonment without the possibility of parole. Our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2) (as amended by *per curiam* order July 15, 1996). Appellant raises five points for reversal. We find no error and affirm.

Appellant and Heath Kennedy were arrested and charged with capital murder for the March 5, 1994 shooting death of Leona Cameron, a clerk of the Subway Sandwich Shop in El Dorado, Arkansas. Heath Kennedy was tried first and convicted of capital murder. This court affirmed the conviction in *Kennedy v. State*, 325 Ark. 3, 923 S.W.2d 274 (1996). Details of the crime are outlined in that opinion, and we will not duplicate recitation of those facts except as they may be pertinent to the particular issues raised in this appeal.

## Motion for Continuance

Appellant contends that the trial court erred in denying his motion for continuance, which was made on the basis of the alleged necessity to secure expert witnesses to review previous psychiatric testing conducted on Appellant by doctors at the Arkansas State Hospital.

■ ■ The grant or denial of a continuance is within the sound discretion of the trial court, and the decision will not be reversed absent an abuse of discretion amounting to a denial of justice. *Turner v. State*, 326 Ark. 115, 931 S.W.2d 86 (1996). An accused is presumed competent to stand trial, and the burden of proving incompetence is on the accused. *Id.* A.R.Cr.P. Rule 27.3 provides:

> The court shall grant a continuance only upon a showing of good cause and only for so long as is necessary, taking into account not only the request or consent of the prosecuting attorney or defense counsel, but also the public interest in prompt disposition of the case.

■ The following factors are to be considered by the trial court in deciding a continuance motion: (1) The diligence of the movant; (2) the probable effect of the testimony at trial; (3) the likelihood of procuring the attendance of the witness in the event of a postponement, and (4) the filing of an affidavit, stating not only what facts the witness would prove, but also that the appellant believes them to be true. *Turner*, 326 Ark. 115, 931 S.W.2d 86.

The following facts are relevant to this issue. Appellant was charged with capital murder on March 9, 1994, and subsequently entered a plea of not guilty by reason of mental disease or defect. On August 5, 1994, the defense filed a motion requesting that Appellant be transferred to the University of Arkansas for Medical Sciences Hospital in Little Rock for examination by Dr. Daryl Matthews, who had been retained by Appellant, to determine the existence of any physical, emotional, or psychological defects. The trial court granted the motion on September 22, 1994.

On December 2, 1994, the defense filed a motion for continuance on the ground that the examination had not taken place as of that date and, thus, it had not been determined whether Appellant was fit to proceed with trial. That motion was granted by order filed the same date. On December 15, 1994, the trial court entered an order for an evaluation of Appellant to be conducted at the Arkansas State Hospital.

Approximately seven months later, on July 13, 1995, a letter from the prosecuting attorney was filed with the circuit clerk's office notifying the trial court that Appellant's evaluation had been received from the state hospital. Included with the prosecutor's letter, was a copy of a letter to the trial court, succinctly reflecting the scientific conclusions, and the accompanying forensic evaluation completed by Dr. O. Wendall Hall, III and Dr. John R. Anderson. Contained at the end of the letter was a list of those persons, including Appellant's counsel, to whom a copy of the letter had been sent. The evaluation indicated that Appellant was capable of cooperating in the preparation of his defense and that, at the time of the commission of the crime, Appellant did not lack the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The evaluation further indicated that two Minnesota Multiphasic Personality Inventory—II tests had been given to Appellant, but that the first test was determined to be invalid and was thus not scored. The reason provided in the evaluation for the invalidity of the first MMPI-II test was that, "Mr. Miller either did not read the items or read and answered the items in an attempt to over report psychiatric problems."

On August 11, 1995, the defense filed a motion for additional testing, on the recommendation of Appellant's retained psychiatrist, Dr. Sarah L. Strebeck, to determine whether Appellant suffered from organic brain disorder. Two weeks later, the defense filed a motion for appointment of an expert to conduct the examination for possible organic brain damage resulting from his possible involuntary exposure to alcohol while his mother was pregnant with him. The motion for additional testing was granted on October 2, 1995, and was to be provided at the state hospital as determined by Dr. Strebeck.

On November 1, 1995, the defense filed a second motion for continuance on the ground that Appellant was currently undergoing additional testing at the state hospital and that the defense did not believe there would be enough time to obtain the results of the testing in order to prepare for the trial, which was set for November 13, 1995. In an order filed November 7, 1995, the trial court granted the continuance and reset the trial for January 16, 1996.

A second forensic evaluation from the state hospital, filed on December 8, 1995, reflected that Appellant had been examined by Dr. Joe Alford for neurological assessment. Dr. Alford's report indicated:

> Taken together, available data suggest relatively mild to moderate cortical dysfunction that is primarily evidenced through deficits on memory-based tasks and tasks involving ongoing attention and concentration. At the same time, he is of average intelligence, and he manifests some real strengths on complex cognitive tasks. He does display the kind of weakness on tasks requiring executive functions that is sometimes associated with poor impulse control. I find no evidence to suggest that Mr. Miller suffers from residuals from Fetal Alcohol Syndrome, since he does not display the intellectual deficits that are almost invariably associated with that syndrome.

The report further indicated that the additional tests conducted on Appellant were interpreted as being normal.

Over one month later, on January 11, 1996, the defense filed several motions, one of which was for the appointment of a forensic psychologist to interpret the two MMPI-II tests given to Appellant in June 1995. The defense claimed that it had not been provided with the actual tests until January 9, 1996, when defense counsel demanded the tests from the prosecutor. The defense also filed a third motion for continuance on the ground that Appellant was "shocked" by the findings of Dr. Alford's assessment and that, on the advice of its two retained expert witnesses, it needed a continuance in order to procure a neuropsychologist from out of state, because of the alleged difficulty in obtaining one of competence in Arkansas.

A hearing was conducted on the third motion for continuance on January 12, 1996. After hearing testimony from Dr. Alford and extensive argument from both sides, the trial court denied Appellant's motion on the bases of the evidence presented by Dr. Alford and the forensic evaluations completed at the state hospital, neither of which indicated any reason for additional testing. The trial judge stated that he had read the information submitted by the defense's two consultants, but that he saw no need for further testing because the defense experts merely referred to hypothetical mental defects, rather than some probable or concrete mental ailments. The trial court then instructed Dr. Alford to interpret the two previously administered MMPI-II tests, which the doctor stated could be done in a matter of hours, and provide that information to the defense. The court then denied the motions for the appointments of additional experts for the defense.

Additionally, it is worth noting that during that hearing, defense counsel argued that the State had not provided them with the results of the two MMPI-II tests until they had demanded them from the prosecutor on January 9, 1996. When asked by the trial court whether it was their position that they were unaware of the results of the two tests until that date, defense counsel indicated that they were. The trial court then confronted them with a letter to defense counsel from their own expert, Dr. Jonathan J. Lipman, dated December 26, 1995, which referenced "both MMPI evaluations." Defense counsel then conceded that the two tests were referred to in the original report from the state hospital, but that it was not until they had consulted Dr. Lipman, that they became aware of the significance of the tests, particularly the first test that was not scored.

On January 17, 1996, the first day of trial testimony, the defense renewed its motion for continuance for the above reasons, and also for the reason that it had just received on the previous evening a packet of handwritten notes of the examiners concerning Appellant's evaluations at the state hospital. The motion was again denied by the trial court, stating:

> [T]he Defense has the burden of proof of mental disease or defect. And it seems to me that everything has just been put on

hold until we got ready to go to trial this time. And, now, all of a sudden there's this mad rush to get all this information and postpone the trial again so that more doctors can be brought in.

. . . .

As you will recall, Mr. Hurst, we had a hearing scheduled for January the 3rd, I believe it was on your motion for, on the fitness of this Defendant to proceed to trial. At your request, that hearing was canceled. It seems to me that at that time you had Dr. Lippman's [sic] wish list that he had sent to you on December the 26th. And it would have been an ideal time, I think, to have addressed all those issues right then.

We are convinced that the trial court did not abuse its discretion in denying the motion for continuance. Both evaluations conducted on Appellant indicated that he had not suffered from a mental disease or defect at the time of the commission of the crime, nor that he was incapable of assisting in his own defense. The first evaluation also indicated that the first MMPI-II test was invalid and that such invalidity may have been from Appellant's attempts to purposely appear psychotic. Defense counsel admitted that they were aware of the results of the MMPI-II tests because they were included in the original forensic evaluation, which was filed with the court in July 1995. The fact that they claimed to have been unaware of the tests' significance until they had retained their own expert witnesses is of little consequence, because, as the trial court observed, they were aware of the need to review those tests upon receipt of Dr. Lipman's letter over two weeks before they went to the prosecutor's office to obtain copies of the tests. Thus, not only was it apparent that the defense was merely conducting a fishing expedition into possible, hypothetical mental disorders, it was further apparent that they had not been diligent in seeking the information they requested.

It was Appellant's burden to prove the existence of a mental disease or defect, which he could have easily attempted to do on his own. Instead, the defense chose to employ the strategy of waiting to see what the State's doctors would find and only then retaining their own experts to double-check the results. Given that Appellant was concerned about the possible bias of the state-funded experts, we cannot understand why he did not pursue an

independent MMPI-II test from one of his retained experts long before the time set for trial.

In short, it is clear from the record that Appellant was not diligent in attempting to secure the necessary information on which to build a defense of mental disease or defect. It is equally clear that a continuance for the purpose of obtaining additional testing was unwarranted in light of the fact that every evaluation conducted on Appellant had shown that he did not lack the capacity to appreciate the criminality of his actions nor to conform his conduct to the requirements of the law. As such, the probable effect of the testimony at trial would have been of little benefit to his defense. We therefore find no abuse of discretion and affirm the trial court's denial of the continuance.

### Sufficient Psychiatric Examination

Appellant, who was sixteen years old when he allegedly committed the murder, contends that his constitutional rights to equal protection under the law and a fair trial were violated because he had not been given the same mental evaluation as adult defendants charged with the same crime. His argument appears to center around the testimony of Dr. Alford, that, according to his training and experience with the DSM-IV, the standard diagnostic manual written by the American Psychiatric Association, he could not consider diagnosing Appellant with borderline personality disorder until he was eighteen years of age. During the trial, when asked by defense counsel whether "the truth of the matter is that he's not getting that diagnosis simply because he wasn't 18 years old," Dr. Alford responded that, although Appellant had some traits that may fall within a borderline personality disorder, "even at age 18 I would not diagnose [Appellant] as having that" disorder. Additionally, in the pretrial hearing conducted on January 12, 1996, Dr. Alford stated that he found Appellant "very much lacking the typical interpersonal symptoms that are seen in an interview with somebody with a diagnosis of borderline personality disorder."

It is apparent from Dr. Alford's testimony that Appellant was not diagnosed with the personality disorder because he did not exhibit sufficient signs or recognized traits of such disor-

der. Not surprisingly, Appellant cites no convincing authority or argument for his novel proposition that he was not diagnosed with the disorder because of his youth. Because it is not apparent without further research that the argument is well taken, we will not consider it. *Matthews v. State*, 327 Ark. 70, 938 S.W.2d 545 (1997).

## Motion to Transfer to Juvenile Court

Appellant contends that it was error for the trial court to deny his motion to transfer the charge to juvenile court without first having conducted a hearing on the motion as provided in Ark. Code Ann. § 9-27-318(d) (Supp. 1995). As stated previously, Appellant was sixteen years old when he allegedly committed the murder. We note at the outset Appellee's concession that this court's holding in *Hamilton v. State*, 320 Ark. 346, 896 S.W.2d 877 (1995), that an appeal from an order denying transfer of a case to juvenile court must be considered by way of interlocutory appeal or is waived, is not applicable to this appeal as the prosecution against Appellant had been commenced before that decision was issued.

Appellee argues that it is impossible for this court to reach the merits of this issue because Appellant has failed to include in the record on appeal the transcript of the pretrial hearing in which his motion was considered. In his reply brief, Appellant asserts that no hearing was held on the motion and, thus, no transcript exists. In the argument portion of his brief, however, Appellant states:

> The lower court scheduled hearings on all pending motions. No testimony was presented regarding the motion to transfer. The State argued, and the court agreed, that the motion had no merit. The following day, the court made a docket entry which declared:
>
>> motion to transfer to juvenile court is denied based upon the seriousness of the offense.

Obviously, by Appellant's own admission, some type of hearing was conducted in the trial court. That hearing is not included in the record. It is well nigh impossible for us to determine what actually occurred below without the benefit of review-

ing the transcript of the proceeding. For all we know, there may have been a stipulation of facts on the motion, thus eliminating the necessity for testimony. Without a record of the pretrial proceeding, we cannot conduct a meaningful review of Appellant's argument. This court has repeatedly stated that it is the appellant's burden to produce a record sufficient to support his arguments on appeal. *Stanley v. State,* 317 Ark. 32, 875 S.W.2d 493 (1994); *Jones v. State,* 314 Ark. 383, 862 S.W.2d 273 (1993), *cert. denied,* 114 S. Ct. 2743 (1994); *Odum v. State,* 311 Ark. 576, 845 S.W.2d 524 (1993).

A similar situation was presented in *Tucker v. State,* 313 Ark. 624, 855 S.W.2d 948, *rev'd on other grounds,* 314 Ark. 500, 863 S.W.2d 813 (1993), where the appellant argued that his transfer hearing did not meet the due process standards provided in section 9-27-318, but failed to include a transcript of the hearing in the record. This court stated:

> [W]e are at a loss to determine what precisely transpired at the hearing. Without a transcript of the hearing, we must assume that the court ruled correctly based on the arguments and testimony presented. *See Woosley v. Arkansas Real Estate Comm'n,* 263 Ark. 348, 565 S.W.2d 22 (1978); *Finch v. State,* 262 Ark. 313, 556 S.W.2d 434 (1977).

*Id.* at 630, 855 S.W.2d at 951. This court went on to hold in *Tucker* that the criminal information, which charged the appellant with aggravated robbery and kidnapping, in and of itself was sufficient evidence of the serious and violent nature of the crimes to support an order denying the motion to transfer. Additionally, this court observed that it was not necessary for the trial court to give equal weight to each of the factors in section 9-27-318(e).

 Here, Appellant was charged with capital murder for the robbery and resulting death of a clerk, who was shot twice in the head by Appellant. In light of our holding in *Tucker* and our long-standing rule that it is the appellant's burden to produce a sufficient record on appeal, we affirm the trial court's decision not to transfer the charge of capital murder against Appellant to juvenile court.

*Motion for Directed Verdict*

Appellant argues that the trial court erred in denying his directed-verdict motions made at the end of the State's case and at the conclusion of all the evidence. We do not reach the merits of this issue as Appellant's motions below were not sufficiently specific to apprise the trial judge of the particular alleged deficiencies in the evidence presented against him.

At the conclusion of the State's case, Appellant's counsel moved for a directed verdict on the ground that the State had "failed to prove the essential elements of the crime of capital murder and the issue be dismissed and the applicable charge to go forward with would be first degree murder." At the conclusion of presentation of all the evidence, Appellant's counsel renewed his motion for directed verdict, again asserting that the State had "failed to prove the essential elements of the crime of capital murder and that it should be dismissed and that the only charge to go forward be first degree murder."

In order to preserve a sufficiency argument for appeal, proof of the element of the crime that is alleged to be missing must be specifically identified in a motion for a directed verdict, or the issue is deemed not preserved for appeal. *Lovelady v. State*, 326 Ark. 196, 931 S.W.2d 430 (1996). Moreover, while it is true that Rule 4-3(h) requires us to review the record for error in life and death cases, this review presupposes that a proper objection was made at trial. *Webb v. State*, 327 Ark. 51, 938 S.W.2d 806 (1997). *See also Jones v. State*, 323 Ark. 655, 916 S.W.2d 736 (1996). Here, because Appellant failed to make a specific motion for directed verdict indicating the particular deficiencies in the State's proof, it is as if he failed to object at all, and that failure below precludes our review of the sufficiency of the evidence on appeal.

*Motion for New Trial*

Appellant filed a motion for new trial on the grounds that it was error for the trial court to have denied his motion for continuance and that such ruling deprived him of the opportunity

to have been better prepared to present a defense of not guilty by reason of mental disease or defect. The decision of whether to grant or deny a motion for a new trial lies within the sound discretion of the trial court, and this court will not reverse that decision absent an abuse of discretion. *Jones v. State*, 321 Ark. 649, 907 S.W.2d 672 (1995); *Clayton v. State*, 321 Ark. 602, 906 S.W.2d 290 (1995). For the reasons stated above with regard to the trial court's denial of the continuance, we find no abuse of discretion and affirm the trial·court's denial of the motion for new trial.

### Rule 4-3(h)

In accordance with Ark. Sup. Ct. R. 4-3(h), the record of the trial has been examined for rulings adverse to Appellant on objections, motions, and requests by either party, and we find no reversible error.

Affirmed.