Samuel L. HENDERSON *v.* STATE of Arkansas

CR 01-1299 , 80 S.W.3d 374

Supreme Court of Arkansas
Opinion delivered July 5, 2002

702

Morse U. Gist, Jr., Deputy Public Defender, for appellant.

Mark Pryor, Att'y Gen., by: Jeffrey A. Weber, Ass't Att'y Gen., for appellee.

JIM HANNAH, Justice. Appellant Samuel L. Henderson appeals from his conviction for first-degree murder for the shooting death of cab driver Paul Hill, for which Henderson was sentenced to life in prison. Henderson raises eight points on appeal, but concedes that six of those points have no merit and are merely being noted pursuant to Ark. Sup. Ct. R. 4-3(h).

On December 13, 1999, Henderson, Dominic Simpson, and Aaron Burns met at a local youth center in Hot Springs. The three teenagers decided to walk to a Wendy's restaurant, and on the way they stopped at Simpson's aunt's house where Simpson briefly went inside and came out with a bag of clothes. The group proceeded to Wendy's, where Burns went inside to buy a hamburger while Henderson and Simpson talked about "hitting a lick," which Henderson described in his trial testimony as meaning "making money." Simpson called a cab to take the group to "the projects." When the cab arrived, Simpson sat in the front seat and Henderson either sat in the back passenger or back driver's side of the car, while Burns sat in the other back seat. Burns testified at trial that Henderson sat behind the driver. Henderson gave a statement to the police that he was sitting behind the driver, but then testified at trial that Burns actually sat behind the driver while he, Henderson, sat in the back passenger seat. Simpson directed the cab driver, Paul Hill, to take them to 538 Grove Street, a house where Simpson used to live but which was unoccupied at that time. They pulled into the driveway and, according to eyewitnesses, several shots rang out as two of the occupants exited the car while the third, who was in the back

driver's-side seat, leaned over and shot Hill. All three passengers fled.

The police questioned Henderson on December 20, 1999, after his aunt took him to the police station to speak to the police after the shooting. Henderson signed a waiver-of-rights form, and the police took his statement and typed it for his signature. In the statement, Henderson indicated that he was in the back seat behind the driver when they pulled into the driveway at 538 Grove Street, and that he heard three shots and ran from the car. In this statement, Henderson did not indicate that any of the three boys had a gun or that Simpson had retrieved the gun from his house to sell. Henderson was soon arrested by the police and charged with first-degree murder.

A jury trial began on May 21, 2001. During trial, Burns, who was thirteen years old at the time of the trial, testified that when the group was at Wendy's, he saw Simpson hand Henderson something as they talked about "hittin' a lick." When they got in the cab, Burns was in the back passenger seat, and he testified that he saw Henderson, who was in the back driver's seat, pull out a gun and set it in his lap. When they arrived at Grove Street, Burns and Simpson got out of the car and walked up to the vacant house, and Henderson stayed in the car. Burns testified that he then heard four or five gunshots, and Henderson ran to the house, and the group ran to the woods. Burns testified that Simpson asked Henderson whether he killed the driver, and Henderson stated, "I think so." Simpson and Henderson switched jackets, and Simpson hid the gun. Burns told his parents about the incident when he got home, and they went to the police.

The prosecution questioned other witnesses who saw the events on Grove Street where they lived. Bertha Patricia Barron testified that she saw the cab pull into the driveway of the vacant house, and she noted that she thought that to be unusual because no one lived there. She stated she then heard about four gunshots, and she ran into her house until the police came. She testified that she saw three people in the car, and the passenger in the back driver's seat was the person who shot the driver, and that this person wore a jacket with a big star on the back, much like a Dallas

Cowboys jacket. Witness Shaquilla Jones testified that she saw three boys run from the car, and that one of those boys was Simpson. She testified that they were taking off clothes as they ran.

During the defense's case, Simpson's stepfather, Dennis White, testified that days after the shooting, he discovered that his gun and gun clip were missing. Upon questioning Simpson and finding out where Simpson had taken the gun, White and Simpson retrieved it, and White buried it in their backyard. Henderson then testified on his own behalf. He stated that Simpson never showed him the gun although he knew Simpson had it, and that he was just going along for the ride. Henderson testified at trial, unlike his statement to the police, that he rode in the back passenger-side seat. He testified that he only gave the police the incorrect statement about his location in the car because he was scared at the time. He further testified that he did not switch coats with Simpson, and that he did not know who fired the shots.

Following the testimony, jury instructions were proposed by counsel. The case was sent to the jury, and the jury returned with a verdict of guilty on the first-degree murder charge. The trial court then sentenced Henderson to life in prison.

Following trial, defense counsel made a motion for new trial based on juror misconduct. Specifically, defense counsel argued that three jurors slept periodically throughout the trial, and that this violated Henderson's constitutional rights to a fair trial. The defense presented testimony from Henderson's sister, Erika Henderson, and his mother, Bobbie Conway, that these jurors fell asleep. Neither woman, however, told defense counsel or the court about the alleged conduct until after trial. The trial court denied the motion for new trial. Henderson filed his notice of appeal on June 4, 2001.

Although Henderson asserts eight points on appeal, only two of those issues are asserted as a basis for reversal. Henderson concedes that the other six issues have no merit. As such, this court will only address Henderson's two meritorious issues in this appeal.

## I. Motion for New Trial

In Henderson's first point for reversal, he argues that the trial court erred in denying his motion for new trial, which alleged that as many as three jurors dozed off and on during the trial. To support his contention, Henderson offered affidavits and testimony from his sister, Erika Henderson, and his mother, Bobbie Conway, that these jurors slept or dozed periodically throughout trial. Both indicated that they did not notify Henderson's attorney or the trial court about this problem until after the trial was over. Henderson argues that this juror misconduct presents a reasonable possibility of prejudice in that twenty-five percent of the jurors were not paying attention at various times during trial. Furthermore, Henderson asserts that defense counsel had no knowledge of this until after trial and, therefore, could not request an admonition by the court to cure the prejudice.

The State counters this assertion by arguing that the trial court did not abuse its discretion in denying the motion for new trial because the defense did not make an affirmative showing that the defense was unaware of this juror misconduct during the trial. The State argues that while the defense filed the affidavits and presented testimony regarding the juror misconduct, neither affidavit addressed whether the defense knew of any misconduct. The State notes that the affidavits indicated that "several courtroom spectators" observed the sleeping jurors. The State argues, however, that if the misconduct had been that apparent, then the defense presumably would have noticed as well, and the burden is on the defense to show that it was unaware of the misconduct. The State concludes that offering affidavits and testimony from spectators that they did not tell the defense of the misconduct does not address whether the defense was aware of the misconduct, and Henderson's assertion that he did not see the misconduct also does not address whether his counsel observed it.

■ ■ The decision on whether to grant or deny a motion for new trial lies within the sound discretion of the trial court. *State v. Cherry*, 341 Ark. 924, .20 S.W.3d 354 (2000); *Miller v. State*, 328 Ark. 121, 942 S.W.2d 825 (1997). We will reverse a trial court's order granting or denying a motion for a new trial

only if there is a manifest abuse of discretion. *Id.* A trial court's factual determination on a motion for a new trial will not be reversed unless clearly erroneous. *Clayton v. State,* 321 Ark. 602, 906 S.W.2d 290 (1995). This court has repeatedly held that the issue of witness credibility is for the trial judge to weigh and assess. *Green v. State,* 334 Ark. 484, 978 S.W.2d 300 (1998); *Myers v. State,* 333 Ark. 706, 972 S.W.2d 227 (1998). Accordingly, this court will defer to the superior position of the trial court to evaluate the credibility of witnesses. *Humphrey v. State,* 327 Ark. 753, 940 S.W.2d 860 (1997).

This court requires that "a claim of jury misconduct raised for the first time in a motion for new trial be accompanied by an affirmative showing that the defense was unaware of the misconduct until after the trial." *Carter v. State,* 324 Ark. 395, 921 S.W.2d 924 (1996) (quoting *Oliver v. State,* 322 Ark. 8, 20, 907 S.W.2d 706, 713 (1995)); *Owens v. State,* 300 Ark. 73, 777 S.W.2d 205 (1989); *Hendrix v. State,* 298 Ark. 568, 768 S.W.2d 546 (1989). The burden of proof in establishing jury misconduct is on the moving party. *Owens, supra; Hendrix, supra.* Following allegations of juror misconduct, the moving party bears the burden of proving that a reasonable possibility of prejudice resulted from any such juror misconduct. *State v. Cherry,* 341 Ark. 924, 20 S.W.3d 354 (2000); *Dillard v. State,* 313 Ark. 439, 855 S.W.2d 909 (1993); *Larimore v. State,* 309 Ark. 414, 833 S.W.2d 358 (1992). We will not presume prejudice in such situations. *Id.* The moving party must show that the alleged misconduct prejudiced his chances for a fair trial and that he was unaware of the bias until after the trial. *Trimble v. State,* 316 Ark. 161, 871 S.W.2d 562 (1994). Whether unfair prejudice occurred is a matter for the sound discretion of the trial court. *Butler v. State,* 303 Ark. 380, 797 S.W.2d 435 (1990). Statutory support for granting a new trial is found in Ark. Code Ann. §16-89-130(c)(7) (1987), which states in pertinent part:

> (c) The court in which a trial is had upon an issue of fact may grant a new trial when a verdict is rendered against the defendant by which his substantial rights have been prejudiced, upon his motion, in the following cases:
>
> . . . .

(7) Where, from the misconduct of the jury, or from any other cause, the court is of [the] opinion that the defendant has not received a fair and impartial trial.

In reviewing these standards, we conclude that Henderson failed to meet the requirements justifying a new trial for juror misconduct. As noted, to succeed on a motion for new trial based on juror misconduct, the party requesting the new trial carries the burden to make an "affirmative showing" that the defense was unaware of the misconduct until after trial and that this misconduct prejudiced his chances for a fair trial.

██ Henderson failed to establish even the initial element of an "affirmative showing." Henderson makes no showing in his motion, supporting affidavits, or in testimony from trial that the defense was unaware that any juror was sleeping. The affidavits and trial testimony from Henderson's mother and sister state only that they were aware of up to three sleeping jurors, and that they did not tell Henderson's counsel about their concerns. Merely filing the motion does not qualify as an "affirmative showing" that the defense was unaware of the misconduct at trial. *See Owens, supra.* In *Owens,* the defense filed a motion for new trial claiming juror misconduct after a juror allegedly spoke to others about the case and the defendant's possible involvement in the crime despite an admonition from the trial court after being selected to be on the jury but before the trial started. Although the defense presented testimony from a witness about the alleged incident, we noted that the defense failed to affirmatively show that they did not know about the alleged misconduct, and that we, therefore, were "unaware" of when the appellant first learned of the remarks attributed to the juror. *Owens,* 300 Ark. at 78–79. We explained in *Owens* the importance of this affirmative showing by the defense, stating, "To allow otherwise would permit a defendant, privy to asserted jury misconduct during the trial, to await the outcome of the trial before investigating or pursuing such allegations further." *Owen,* 300 Ark. at 78. In further support of the requirement of an "affirmative showing" of lack of knowledge of the misconduct at trial, this court in *Oliver, supra,* noted that even allegations in the motion itself, without evidence supporting the affidavit, will not suffice for the court to determine whether error

occurred. Rather, actual evidence is necessary to show that the defense was unaware at trial of the misconduct. Based on this lack of evidence, we cannot say that the trial court abused its discretion in denying Henderson's motion for new trial.

## II. Jury Instructions

In his second point for reversal, Henderson argues that the trial court erred in refusing to give his proffered accomplice liability jury instructions. He argues that he offered a modified instruction of AMCI2d 404 regarding a defendant's "mere presence" without participation at the scene of the crime, and that the trial court should have given this instruction to the jury. He also asserts that his two other proposed modified instructions about accomplice liability should have been read to the jury, and that it was reversible error that none of the instructions were given.

The State responds that the accomplice-liability instruction, which was read to the jury, implicitly instructs the jury that mere presence at a crime scene is not sufficient to sustain a conviction and, therefore, failure to give Henderson's separate "mere presence" instruction was not reversible error.

This court has repeatedly stated that if there is some evidentiary basis for a jury instruction, giving the same is appropriate. *Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998); *Yocum v. State*, 325 Ark. 180, 925 S.W.2d 385 (1996); *Mitchell v. State*, 314 Ark. 343, 862 S.W.2d 254 (1993). A party is entitled to an instruction if there is sufficient evidence to raise a question of fact or if there is any supporting evidence for the instruction. *Humphrey v. State*, 332 Ark. 398, 966 S.W.2d 213 (1998) (citing *Yocum, supra*). There is no error in refusing to give a jury instruction where there is no basis in evidence to support the giving of the instruction. *Id.* Our law is well settled that, when a trial court determines that the jury be instructed on an issue, the model criminal instructions shall be used unless the trial court concludes it does not accurately state the law. *Webb v. State*, 326 Ark. 878, 935 S.W.2d 250 (1996); *Moore v. State*, 317 Ark. 630, 882 S.W.2d 667 (1994). In determining if the trial court erred in refusing an instruction in a criminal trial, the test is whether the omission

infects the entire trial such that the resulting conviction violates due process. *Branstetter v. State*, 346 Ark. 62, 57 S.W.3d 105 (2001); *Conley v. State*, 270 Ark. 886, 607 S.W.2d 328 (1980). *See also, Cox-Hilstrom v. State*, 58 Ark. App. 109, 948 S.W.2d 409 (1997).

Henderson presented three instructions dealing with accomplice liability that he wanted the trial court to read to the jury. The first proposed instruction stated:

> A person does not commit an offense unless his liability is based on conduct that includes a voluntary act or the omission to perform an act which he is physically capable of performing.

The second proposed instruction stated:

> Our law does not require a person to prevent or attempt to prevent the commission of a criminal offense by another person unless the law imposes a specific legal duty to do so. For instance, the law might require a parent to prevent injury to a child and, thus, failure to prevent injury may constitute a violation of the law. However, there is no general duty placed upon any person to prevent the commission of any offense in the absence of a legal duty to do so.

As the State argued at trial, and as the trial court found, these instructions are not necessary because AMCI2d 401 "Accomplices — Definition and Joint Responsibility" inherently includes this information within the instruction. AMCI2d 401 states:

> In this case, the State does not contend that ___ acted alone in the commission of the offense(s) of ___. A person is criminally responsible for the conduct of another person when he is an accomplice in the commission of an offense.
>
> An accomplice is one who directly participates in the commission of an offense or who, with the purpose of promoting or facilitating the commission of an offense:
>
> [Solicits, advises, encourages or coerces the other person to commit the offense;] [or]
>
> [Aids, agrees to aid or attempts to aid the other person in planning or committing the offense.] [or]

[Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.]

### Definition

"Purpose." — A person acts with "purpose" with respect to his conduct or a result thereof when it is his conscious object to engage in conduct of that nature or to cause such a result.

The model instruction has its genesis in Ark. Code Ann. § 5-2-403(a) (Repl. 1997). Except for the last clause "Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so," the trial court read this instruction to the jury and referred them to the previously-read instruction defining "purpose." Therefore, the model instruction read to the jury generally encompassed the elements proposed by Henderson's first proposed instruction above, as Henderson's proposed instruction is a basic statement regarding "purposeful" and "knowing" conduct.

As for Henderson's second proffered instruction noted above, the court did not read the third clause of AMCI2d 401 dealing with the "legal duty," which then raises the issue as to whether there was any evidence to support giving this section of AMCI2d 401. Here, there was no reason for the court to give the last clause of AMCI2d 401 or Henderson's second proposed instruction because Henderson was not charged with failing to prevent an offense that he had a duty to prevent. Rather, he was charged with actually participating in the crime itself. In fact, Henderson testified that he did not know from where the shots came as he exited the car; thus, by his own testimony, he could not have been under a legal duty to prevent the crime he claimed he knew nothing about. Therefore, the trial court did not err in refusing to read the last section of AMIC2d 401 or Henderson's second proposed instruction.

Finally, Henderson's third proffered instruction stated:

Mere presence, acquiescence, silence, or knowledge that a crime is being committed, in the absence of a legal duty to act, is not sufficient to make one an accomplice. Therefore, if you find that Samuel L. Henderson was only present while a crime was

being committed and did not have a legal duty to act, then he is not an accomplice. If you have a reasonable doubt as to whether Samuel L. Henderson was an accomplice or merely present at the commission of an offense, then you will acquit the Defendant.

This instruction on "mere presence" tracks but is not identical to the model instruction in AMCI2d 404. Because it is not the model instruction, the trial court did not err in refusing to give this instruction. *Webb, supra; Moore, supra.*

 Furthermore, when Henderson requested this instruction, the prosecutor argued and the trial court found that this instruction was unnecessary because our case law indicates that AMCI2d 401 and 403 implicitly include that "mere presence" or acquiescence at the crime scene is not sufficient for a conviction. This is a correct statement of our case law. *See Jones v. State,* 336 Ark. 191, 984 S.W.2d 432 (1999); *Smith v. State,* 334 Ark. 190, 974 S.W.2d 427 (1998); *Calloway v. State,* 330 Ark. 143, 953 S.W.2d 571 (1997); *Williams v. State,* 329 Ark. 8, 946 S.W.2d 678 (1997); *Webb v. State,* 326 Ark. 878, 935 S.W.2d 250 (1996). In *Smith,* for example, this court reiterated its earlier position in *Williams, supra,* and *Webb, supra,* declining the opportunity to alter AMCI2d 401 to reflect the legal principle that a person's mere presence is not enough to establish accomplice liability because AMCI2d 401 "accurately and completely reflects the law of accomplice liability." *Smith,* 334 Ark. at 198.

However, in *Jones, supra,* this court was again faced with a proffered "mere presence" instruction. We stated in *Jones* that the "mere presence" instruction

> was not a model instruction at the time of the trial although a similar instruction was apparently adopted by this court's Criminal Instruction Committee and sent to the Michie Publishing Company in August 1997, just after the trial but the same month of the trial. This court has held in the past that a trial court committed no error in refusing to instruct the jury with the "mere presence" language. *See Calloway v. State,* 330 Ark. 143, 953 S.W.2d 571 (1997); *Williams v. State,* 329 Ark. 8, 946 S.W.2d 678 (1997); *Webb v. State,* 326 Ark. 878, 935 S.W.2d 250 (1996). We observed in those cases that it is implicit in the accomplice liability instruction, which states that a party must

> solicit, advise, encourage, coerce, aid, agree to aid, or attempt to aid the principal to commit the crime, that mere presence or acquiescence at the crime scene is not enough. Accordingly, even though the Criminal Instruction Committee has now adopted a "mere presence" instruction, our case law is clear that refusal to instruct on mere presence is not reversible error.

*Jones*, 336 Ark. at 205-206. We noted that although the trial court in *Jones* did not have the benefit of the newly created AMCI2d 404 "mere presence" instruction when making its decision to deny the proffered "mere presence" instruction, failure to instruct on "mere presence" is not reversible error because prior case law indicated that that element is inherent in AMCI2d 401 and 403. According to our prior case law, AMCI2d 401, which was read to the jury, implicitly includes the "mere presence" element.

In this case, failure to give AMCI2d 404 when requested cannot be error here because AMCI2d 401 and AMCI2d 403 were given. As such, the test for reversing on this issue — whether the omission infects the entire trial such that the resulting conviction violates due process — cannot be satisfied here. *See Branstetter, supra; Conley, supra.*

### III. Rule 4-3(h)

In accordance with Rule 4-3(h) of the Arkansas Supreme Court Rules, the record has been reviewed for adverse rulings objected to by Appellant but not argued on appeal, and no reversible errors were found.

Affirmed.

IMBER, J., not participating.