Cite as 2020 Ark. App. 529

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** CR-20-2

| | | |
|---|---|---|
| | | **Opinion Delivered:** November 18, 2020 |
| GRANVILLE MURPHY | APPELLANT | APPEAL FROM THE MISSISSIPPI COUNTY CIRCUIT COURT, CHICKASAWBA DISTRICT [NO. 47BCR-19-67] |
| V. | | |
| | | HONORABLE RALPH WILSON, JR., JUDGE |
| STATE OF ARKANSAS | APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Granville Murphy was convicted in a jury trial of aggravated robbery committed against Gerrart Malone.[1]  Murphy was sentenced to fifteen years in prison with a five-year enhancement for employing a firearm to commit the offense, for a total of twenty years in prison.  Murphy now appeals.

Murphy raises three arguments on appeal.  First, he argues that the trial court erred in denying his motion for directed verdict because there was insufficient evidence to support the conviction.  Next, he contends that the trial court erred in denying his motion in limine and admitting evidence of Murphy's gang affiliation.  Finally, Murphy assigns error to the trial court's refusal to give the "mere presence" jury instruction.  We affirm.

---

[1]The felony information charged Murphy with committing this offense "acting alone or with one or more persons."

Pursuant to Ark. Code Ann. § 5-12-103(a)(1) (Repl. 2013), a person commits aggravated robbery if he or she commits robbery and the person is armed with a deadly weapon. A person commits robbery if, with the purpose of committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person. Ark. Code Ann. § 5-12-102(a).

The victim, Gerrart Malone, testified that he is employed as a service technician for Black Hills Energy. On February 6, 2019, at about 9:00 a.m., Malone drove his service truck to a trailer park to complete a work assignment. As he sat in the truck gathering information about the job, Malone saw a white car park directly behind his truck.

Malone testified that a man exited from the passenger's side of the white car and approached him in his truck. Malone rolled down his window and asked the man if he needed any help. According to Malone, the man then pulled out a handgun, cocked it, and stuck it in Malone's face. The man told Malone to give him everything he had. Malone gave the man his two cell phones.[2] Malone also reached into his back pocket and gave the man his wallet. Malone then gave the man cash from his front pocket. The man asked Malone to step out of the truck and give him the change from his pockets, and Malone complied. All of this occurred while the man was pointing the gun at Malone.

When Malone told the man that he had given him everything he had, the man took Malone's keys and walked back to the white car. The man got back into the car on the passenger's side and the car drove off. Malone used a nearby resident's phone and called the

---

[2]One of the cell phones was a Samsung Galaxy 8, which the police later returned to Malone.

2

police. Upon questioning by the police, Malone described the suspect as a black male about six feet one who weighed about 275 pounds, and that he had a round face with some facial scruff. Malone testified that the man's face was not covered during the robbery, so he was able to see him. Malone also gave the police the first three numbers of the white car's license plate, which he was able to write down before the car had left his sight.

On the following day, Malone went to the police department and was shown two photo lineups. Malone did not positively identify Murphy from either of these lineups. Malone testified that, in the second lineup, person #5 caught his attention because it looked like the culprit, but he did not select him at that time because he was not 100 percent sure.[3] However, when viewing Murphy in person at trial, Malone stated that Murphy was person #5 in the photo lineup and that he was 100 percent positive that Murphy was the man who had approached his truck and robbed him that day.

Isaiah Robinson was arrested in connection with the robbery.[4] Robinson testified that he did not know Granville Murphy by his real name, but knew him only as "Big-G" or "Big-Five." Robinson stated that Murphy "looks to be about 6'3" or 6'4" . . . and about 300 pounds." Robinson stated that although he was arrested in connection with the robbery of Malone, he was not involved. Robinson did state, however, that sometime after the robbery, Murphy asked him to sell a Galaxy cell phone. Murphy told Robinson that the phone was not stolen and that he needed Robinson to sell it for him because he had no

---

[3]The officer who showed Malone this photo lineup later testified that Malone had told him he thought person #5 looked like the perpetrator but that Malone did not want to pick someone unless he was 100 percent certain.

[4]The record is unclear as to the disposition of Robinson's arrest.

identification.  Robinson indicated that Murphy drove him to Walmart in a white car. Robinson testified that he sold the Galaxy phone at Walmart for $90 and gave Murphy the money.  According to Robinson, this phone was later identified as one of the phones taken from Malone.

Officer Branton Hall testified that on the day of the robbery, he received a phone call from another officer providing the description of a possible robbery suspect described as a black male, six feet two or six feet three inches, heavy set, and said to be driving a white Kia Optima.[5]  Officer Hall subsequently made contact with the white Kia Optima and made a traffic stop.  Murphy was driving the car, and two teenage boys were with him.[6]  Murphy did not have any identification with him, but he accurately identified himself to the police. Officer Josh Murray, who assisted Officer Hall, testified that Murphy matched the general description of the robbery suspect.

Murphy was taken to the police station and questioned about the robbery.  In a custodial Mirandized interview, Murphy at first denied any knowledge of the robbery but later admitted that he had driven the white car to the trailer park while another man exited the car and committed the offense.[7]

Murphy testified in his defense.  Murphy indicted that it was Isaiah Robinson, and not he, who committed the robbery.  Murphy stated that on the morning of the robbery,

---

[5]The white Kia Optima was later determined to be owned by a lady named Natasha, Murphy's girlfriend.

[6]The boys were later identified as Natasha's two sons.

[7]This custodial interview is discussed more fully below in the section pertaining to the appellant's motion in limine.

he was driving Natasha's white car and that Robinson rode as a passenger. According to Murphy, Robinson had told him "he was gonna hit a lick." Murphy testified that "hit a lick" means robbing someone, but it could also mean "trying to come up [with] money, job, or anything." Murphy stated that he drove Robinson to the trailer park, but that he did not know Robinson had a gun and did not think a robbery was about to occur. Murphy stated that he parked behind Malone's truck and stayed in the car as Robinson exited from the passenger's side. Murphy stated that after Robinson robbed Malone, he drove Robinson to Walmart where Robinson sold a cell phone.

Murphy's first argument on appeal is that the trial court erred in denying his motion for directed verdict. A motion for directed verdict is a challenge to the sufficiency of the evidence. *Davis v. State*, 2009 Ark. App. 753. In reviewing a challenge to the sufficiency of the evidence, we determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Thompson v. State*, 2015 Ark. App. 275, 461 S.W.3d 368. Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id*. This court views the evidence in the light most favorable to the State, and only evidence supporting the verdict will be considered. *Id*. The credibility of witnesses is an issue for the jury and not this court. *Id*. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id*.

Murphy argues that the State's evidence was insufficient to establish his participation in the robbery. Murphy asserts that, although Malone positively identified him at trial as the man who robbed him at gunpoint, Malone's description of him to the police was

inaccurate in that he is a much larger man. Murphy further notes that Malone had failed to positively identify him when shown a photo lineup. Murphy also contends that it is unreasonable to conclude that he was a passenger in the white car as opposed to the driver—as testified to by Malone—given that Murphy was driving the car when it was stopped by the police later that day. Finally, Murphy argues that there was insufficient evidence that he acted as an accomplice because his testimony showed only his mere presence in the driver's seat of the car while the robbery was being committed. For these reasons, Murphy asserts that the jury was required to speculate to conclude that he was either a principal or an accomplice to aggravated robbery.

We conclude that Murphy's sufficiency challenge lacks merit. In this case there was conflicting testimony. The victim, Malone, testified that Murphy was a passenger in the white car and that he was "one hundred percent positive" that Murphy was the person who robbed him. In Isaiah Robinson's testimony, he denied any participation in the robbery but stated only that he unwittingly sold a stolen phone given to him by Murphy at Murphy's request, not knowing the phone was stolen. Murphy, on the other hand, testified that he was the driver of the white car, that Robinson was a passenger, and that Robinson committed the robbery. Weighing the evidence, reconciling conflicts in the testimony, and assessing credibility are all matters exclusively for the trier of fact. *Holland v. State*, 2017 Ark. App. 49, 510 S.W.3d 311. Viewing the evidence in the light most favorable to the State and leaving credibility decisions to the trier of fact, Malone's testimony constituted substantial evidence to support Murphy's aggravated-robbery conviction.

6

Murphy's next argument is that the trial court erred in denying his motion in limine and admitting evidence of his gang affiliation. Murphy takes issue with the admission of his recorded statements to the police that he was a member of the Vice Lords gang. Murphy argues that this evidence was inadmissible under Arkansas Rule of Evidence 403, which provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

Prior to trial, Murphy filed a motion in limine to prohibit any reference to his being a member of the Vice Lords gang. Murphy argued that any evidence that he belonged to a gang should be excluded under Arkansas Rule of Evidence 403 because such evidence was unfairly prejudicial. At a pretrial hearing, the trial court at first ruled that it was neither granting nor denying the motion and would wait and see how the evidence played out at trial. When Murphy pressed the trial court for a ruling at the pretrial hearing, the trial court orally denied the motion in limine.

However, this issue was reargued and reconsidered at trial. During a conference at trial, the State indicated that it intended to play the audio recording of Murphy's custodial statement to the jury through Detective Jason Simpkins' testimony. Murphy objected and argued that any evidence of his gang activity in the recording should be excluded because it was irrelevant to the aggravated-robbery charge. The trial court expressed its willingness to revisit this issue, stating that it had "some concern" about whether gang involvement should come into evidence. The trial court stated that it would allow the prosecution to play the recording in open court up until the point where gang activity was mentioned, at which time the prosecutor would stop the recording. The trial court indicated that it would

7

then listen to the remainder of the recording in chambers before deciding whether to admit the gang references therein.

The recorded interview was played to the jury. When references to Murphy's gang affiliation were about to be mentioned in the recording, the recording was stopped, and the jury was recessed. Counsel and the trial court retired to the judge's chambers to continue the discussion. The trial court stated:

> For the record, we are now in chambers outside the presence of the jury with the defendant and [defense counsel] and the prosecutor. . . . [Defense counsel] had objected to references of gang activity and we are in chambers for the court to hear this matter in camera to see if it is admissible and we are playing it now and that's the determination. . . . I think the . . . recording was stopped at this point so the jury wasn't contaminated and the court will have an opportunity to hear and decide this issue so you can continue to play it now.

The recorded interview continued in chambers outside the presence of the jury. In this portion of the interview, Murphy stated that he is a member of the Vice Lords gang. Murphy then explained in the interview that he knew the man that he had dropped off at the trailer park because they were both in the gang and were "Vice Lords brothers."

At the conclusion of the recording, while still in chambers, a discussion commenced about whether references to the gang activity should be played to the jury. Murphy argued that it was inadmissible, stating that it would do irreparable harm to let the jury hear Murphy talking about the Vice Lords and the gang activity. The trial court agreed, and stated:

> At that point, I don't know that there is any relevance—there is only marginal—and I think it is unduly prejudicial when the officers start talking about the Vice Lords and trying to get other information and Murphy voluntarily answers those questions. . . . I'm ruling that the tape can be played until . . . the officers start asking about the Vice Lords. . . . So we've got to figure out a way to delete that part I've said is not relevant or unduly prejudicial under 403[.]

8

The prosecutor then asked for clarification about whether references to the Vice Lords was "out," and the trial court replied, "I think so." The prosecutor inquired about Murphy's statements wherein he referred to his passenger as his Vice Lords brother, and Murphy argued that "the jury shouldn't be allowed to hear that." The trial court stated, "All right, that will be granted then." From this colloquy, it is evident that the trial court *granted* Murphy's objection to any references to the Vice Lords gang. The trial court concluded by giving the prosecutor "a few minutes" to make the necessary arrangements so that the excluded portion would not be played to the jury. This concluded the in-chambers review.

The jury returned and the playing of the custodial interview resumed. However, despite the trial court's ruling to the contrary, the part of the interview where Murphy admitted being a member of the Vice Lords gang was played to the jury. When this was played to the jury, Murphy made no further comment or objection.

The argument that Murphy makes on appeal is that the trial court erred in *denying* his motion in limine and in admitting evidence of his gang affiliation. We conclude that Murphy's argument is misplaced because, contrary to Murphy's claim on appeal, the trial court ultimately did not deny his objection to gang references. Although the trial court initially indicated at the pretrial hearing that it would deny Murphy's motion in limine, the trial court changed its prior ruling and clearly *granted* Murphy's motion based on Rule 403 when it was renewed at trial and ordered the prosecutor to remove any portion of the recording that referenced gang affiliation. The sole argument made by Murphy under this point is that the trial court erred in *denying* his objection when, in fact, the court granted his objection and he received a favorable ruling on the issue. Although evidence of Murphy's

9

involvement in the Vice Lords gang was subsequently played to the jury in the recorded interview in violation of the trial court's ruling, the only issue Murphy raises on appeal is that the trial court's adverse evidentiary ruling was erroneous. However, there is no adverse evidentiary ruling to review. Limiting our review to the argument raised on appeal, we conclude that no error occurred.

Murphy's final argument is that the trial court erred in failing to give the "mere presence" jury instruction. This instruction is set forth in AMI Crim. 2d 404, which Murphy proffered at trial, as follows:

> Mere presence, acquiescence, silence, or knowledge that a crime is being committed, in the absence of a legal duty to act, is not sufficient to make one an accomplice. Therefore, if you find that Granville Murphy was only present while a crime was being committed and did not have a legal duty to act, then he is not an accomplice.

A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *Pokatilov v. State*, 2017 Ark. App. 150, 516 S.W.3d 285. Murphy argues that while there was conflicting evidence presented, there was evidence that he was merely present during the robbery and did not solicit or encourage the commission of the offense. Murphy maintains that in both his recorded statement and in his testimony, he admitted he was present but did not know anyone was going to be robbed. Thus, Murphy contends that the trial court abused its discretion in not giving the "mere presence" instruction.

We conclude that no error occurred with respect to the jury instructions given by the trial court. This is because, although the "mere presence" instruction was not given to the jury, the accomplice-liability instruction (AMI Crim. 2d 401) was given, as follows:

10

In this case, the State does not contend that Granville Murphy acted alone in the commission of the offense charged. A person is criminally responsible for conduct of another person when he is an accomplice in the commission of the offense.

An accomplice is one who directly participates in the commission of an offense or who, with the purpose of promoting or facilitating the commission of an offense:

> Solicits, advises, encourages, or coerces the other person to commit the offense; or

> Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense.

Our supreme court has repeatedly held that it is implicit in the accomplice-liability instruction that mere presence at the crime scene is not enough to support accomplice liability. *Strain v. State*, 2012 Ark. 184, 423 S.W.3d 1; *Henderson v. State*, 349 Ark. 701, 80 S.W.3d 374 (2002); *Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999). Additionally, the failure to give the "mere presence" instruction (AMI Crim. 2d 404), even when it is properly requested, cannot be reversible error when, as here, AMI Crim. 2d 401 was given. *See Strain*, *supra*; *Brown v. State*, 2015 Ark. App. 427, 468 S.W.3d 282. That being so, Murphy has demonstrated no reversible error under this point.

Having reviewed Murphy's arguments on appeal, we conclude that no reversible error occurred below. Consequently, Murphy's aggravated-robbery conviction is affirmed.

Affirmed.

KLAPPENBACH and BROWN, JJ., agree.

*Robert M. "Robby" Golden*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Michael Y. Yarbrough*, Ass't Att'y Gen., for appellee.