Beau JONES *v.* STATE of Arkansas

CR 00-977                                   42 S.W.3d 536

Supreme Court of Arkansas
Opinion delivered May 10, 2001

*William R. Simpson, Jr.*, Public Defender, by: *Deborah R. Sal-lings*, Deputy Public Defender, for appellant.

*Mark Pryor*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Beau Jones appeals from his conviction for capital murder and his life sentence, and argues solely that the trial court erred in denying his motion to suppress his two confessions. We find no error, and therefore affirm.

Jones does not challenge the sufficiency of the evidence, so we need only provide a short summary of the facts relevant to addressing Jones's suppression issue. Sometime on December 4, 1998, Melissa Ma disappeared. Her roommate, Amanda Stacks, notified

the police on December 5 that Melissa had borrowed her car on the morning of December 4, but had not returned to their apartment. Melissa and Amanda had roomed together since Melissa broke up with her boyfriend, Beau Jones, a few weeks earlier. Melissa's family notified the police on December 7 that she was missing. During the course of their investigation, the Little Rock police questioned Beau Jones several times, with the first time occurring on December 9, 1998. At that time, Jones was not considered a suspect in Melissa's disappearance, and he denied any involvement in the matter. The police spoke with Jones again on December 13. That day, Jones was taken to the Little Rock police department, read his *Miranda* rights, and questioned; after that, the police released him.

On December 14, 1998, the police again picked Jones up and took him to the police station. This time, they handcuffed him and put him in the back of a squad car. Detective Ronnie Smith took Jones into an interview room at the police station and advised him of his *Miranda* rights. Jones indicated that he understood each of the rights read to him, and gave a statement consistent with his prior ones denying any knowledge of Melissa's disappearance.

On December 15, Melissa's body was found near Ferndale in western Pulaski County; she had been shot twice in the head. Jones was subsequently arrested and once more taken to the Little Rock police department. Detective Smith again read him his *Miranda* warnings, and Jones signed a waiver of his rights. Shortly thereafter, on the same day, Detective Smith began taping Jones's statement. Jones at first continued to deny any involvement in Melissa's disappearance, but after the detective told him the police had found her body and started to describe what she was wearing, Jones became emotional and asked to see a photo of Melissa. He then confessed to having killed her.

After Jones gave his first confession, Officer David Bratton transported Jones by car from the police department to the Pulaski County Jail. During that drive, Jones started to cry and exclaimed, "Man, I did not mean for the gun to go off." Bratton, who had not asked Jones any kind of question prior to that statement, replied, "Are you telling me that you did it?" Jones responded, "Yeah, I killed her. Man, you don't understand. I deal a lot of drugs, and she was going to turn me in. I couldn't let her do that, because I didn't want to go to jail. So, I put a gun on her trying to scare her, and it went off. Man, I killed her. I still can't believe I did it, but I killed her."

Prior to trial, Jones moved to suppress his two confessions, but the trial court denied the motion. The case proceeded to trial on January 18, 2000, and the jury convicted him of capital murder. As noted above, Jones argues on appeal only that the trial court erred in denying his motion to suppress the two statements he gave to the police on December 15.

When reviewing a trial court's decision on a motion to suppress, this court views the evidence in the light most favorable to the State and makes an independent determination based upon the totality of the circumstances. *Steggall v. State*, 340 Ark. 184, 8 S.W.3d 538 (2000). This court will only reverse a trial court's ruling on a motion to suppress if the ruling was clearly erroneous. *Id.*

A statement made while an accused is in custody is presumptively involuntary, and the burden is on the State to prove, by a preponderance of the evidence, that a custodial statement was given voluntarily and was knowingly and intelligently made. *Smith v. State*, 334 Ark. 190, 974 S.W.2d 427 (1998). In order to determine whether a waiver of *Miranda* rights is voluntary, this court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Diemer v. State*, 340 Ark. 223, 9 S.W.3d 490 (2000). In making this determination, we review the totality of the circumstances, and reverse the trial court only if its decision was clearly erroneous. *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997). In determining whether a confession was voluntary, we consider the following factors: age, education, and intelligence of the accused, lack of advice to his constitutional rights, length of detention, the repeated and prolonged nature of the questioning, or the use of physical punishment. *Humphrey*, 327 Ark. at 760; *see also Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998).

Further, the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding the appellant's in-custody confession is for the trial judge to determine, and we defer to the superior position of the trial judge in matters of credibility. *Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998). Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused since he or she is the person most interested in the outcome of the proceedings. *Id.* So long as there is no evidence of coercion, a statement made voluntarily may be admissible against an accused. *Id.*

In the instant case, Jones contends that the two confessions he gave to the police on December 15 were taken in violation of his Fifth Amendment rights because he had asked to speak to a lawyer on December 14, but that his request was ignored, and that one of the detectives who interviewed him on that day threatened him. In support of these contentions, Jones points to his testimony at the suppression hearing, wherein he testified that when the detectives started asking him questions, he told them that he did not know what they were talking about, and that he wanted a lawyer. He said that when he asked for a lawyer, the officers did not respond. At the conclusion of his interview with the police on that day, Jones claimed Detective Ted Atkins threatened him by saying he knew a lot of people in the penitentiary, implying that he could cause trouble for Jones if he discovered Jones was lying.

Detective Atkins denied making any such threat, and further testified that Jones did not, at any time, request an attorney or ask that the interview be stopped. Other officers, including Detectives Ronnie Smith, J.C. White, and Linda Keel, also testified at the suppression hearing that Jones did not request an attorney on December 14. As noted above, the trial court is not required to believe the testimony of any witness, especially the self-interested testimony of the defendant. *Wright*, 335 Ark. at 404. The trial court clearly believed the testimony of the officers, not Jones, and this court defers to the superior position of the trial judge in matters of credibility. *Id.*; *see also Steggall*, 340 Ark. at 195-96 (where the only evidence that appellant asked for an attorney was his own testimony, the issue turned on credibility, and it was in the province of the finder of fact to determine the credibility of a witness).

Jones also contends that his taped confession, given at the police department on December 15, was not freely given because he was under the influence of drugs at the time of his arrest. He also asserts that the statement was the result of a repeated and lengthy interrogation by the police, designed to "break him down," and that his mental state, affected by drug and alcohol consumption, was such that his waiver of his rights was involuntary. He points to statements during his confession that his head was pounding and his heart was "about to explode." During the suppression hearing, Jones testified that he had consumed hallucinogenic mushrooms the day of his confession and that they began to "kick in" while he was giving his statement.

When an appellant claims that his confession was rendered involuntary because of his drug or alcohol consumption, the

level of his comprehension is a factual matter to be resolved by the trial court. *Rucker v. State*, 320 Ark. 643, 899 S.W.2d 447 (1995) (citing *Anderson v. State*, 311 Ark. 332, 842 S.W.2d 855 (1992)). While this court will make a closer examination of the appellant's mental state, we still leave the factual question to the trial court on whether the accused had sufficient capacity to waive his rights. *See McDougald v. State*, 295 Ark. 276, 748 S.W.2d 340 (1988). The test of voluntariness of one who claims intoxication at the time of waiving his rights and making a statement, is whether the individual was of sufficient mental capacity to know what he was saying — capable of realizing the meaning of his statement — and that he was not suffering from any hallucinations or delusions. *Id.* We have also stated that it is significant in making a finding of voluntariness that the accused answered questions without indications of physical or mental disabilities, that the accused remembered a number of other details about the interrogation even though he could not remember waiving his rights, and that a statement was given in a short period of time after his rights had been read to him. *Id.* at 280-81.

Here, although Jones claims to have been under the influence of drugs at the time he gave his statement, at least six police officers, who were present when Jones gave his statements, testified at the suppression hearing that he did not appear to be intoxicated or "high" during the interview. This again was a question of credibility for the trial court to resolve. In addition, the trial judge listened to the tape of the interview, and so was able to hear for himself whether or not Jones sounded as though he were under the influence of drugs or alcohol. Further, looking to the factors enumerated in *McDougald*, Jones was able to remember a number of details about the interrogation and other surrounding events. For example, he testified in detail during the suppression hearing about what he and his friends had been doing the morning of the 15th. He also recalled that when he arrived at the police station, one of the officers accompanying him pulled his shirt over his head to shield Jones from the television cameras that were there. As in *McDougald*, Jones's ability to remember details about the interrogation, even though he was allegedly "confused" about waiving his rights, points to the correctness of the trial court's finding that the statements were freely given.

Next, Jones asserts that he asked Detective Eric Knowles to turn off the tape recorder while Jones was giving his initial statement on December 15; this request, he now argues, was an invocation of his right to remain silent. Detective Knowles testified that he did not interpret this question as meaning that Jones

wanted to terminate the interrogation, saying that Jones never asked to discontinue the interview. In *Standridge v. State*, 329 Ark. 473, 951 S.W.2d 299 (1997), defendant Standridge told the police that he was not ready to talk, but then, almost immediately thereafter, he offered a confession. On appeal, Standridge argued that his statement to the police that he was not ready to talk effectively invoked his right to remain silent pursuant to *Miranda*. Noting that while an individual may cease all questions by indicating that he wishes to remain silent, this court wrote that "the right to remain silent must be made unequivocally, and answering questions following a statement that attempts to invoke the right to remain silent may waive that right by implication." *Id.* at 479 (citing *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995)). Here, Jones made no such unequivocal invocation of his right to remain silent. Instead, he only asked the detectives to turn off the tape recorder. He never indicated that he did not wish to talk, only that he did not wish what he said to be recorded. The trial court's ruling on this point was not erroneous.

Finally, Jones argues that the second confession he gave in the police car, when being driven by Officer Bratton to the Pulaski County Jail, should have been suppressed because it was given without proper *Miranda* warnings. Jones, citing *Rhode Island v. Innis*, 446 U.S. 291 (1980), contends that when Bratton asked Jones, "Are you telling me you did it," the question was "reasonably likely to elicit an incriminating response from [Jones]" and thus was the "functional equivalent of an interrogation." Therefore, Jones urges, because Bratton did not repeat the *Miranda* warnings before asking this question, Jones's responsive statements should have been suppressed.

In *Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998), this court relied on *Wyrick v. Fields*, 459 U.S. 52 (1982), to hold that *Miranda* warnings "must be repeated only when the circumstances have changed so seriously that the accused's answers are no longer voluntary, or the accused is no longer making a knowing and intelligent relinquishment or abandonment of his rights." *Conner*, 334 Ark. at 473. The court continued as follows:

> Although a totality-of-the-circumstances test is required, the Court in *Wyrick*, was particularly influenced by the fact that the accused initiated the second interrogation. We have also acknowledged that the lapse between warnings as well as the number of prior warnings are relevant concerns.

*Id.* (citations omitted).

    ■  Here, it cannot be said that the circumstances had changed dramatically. Jones had already been arrested and been given his *Miranda* warnings; he had also already confessed. The lapse of time between his first confession and his statement to Officer Bratton was only a matter of hours. Further, Jones himself initiated the conversation, volunteering the statement that he "didn't mean for the gun to go off." Finally, Jones had been given his *Miranda* warnings at least three times in the preceding three days. Viewing the totality of the circumstances surrounding Jones's statement to Officer Bratton, we cannot say that the trial court erred in denying Jones's motion to suppress.

    For these reasons, we affirm.