Jimmy R. SMART, Jr. *v.* STATE of Arkansas

CR 02-1013 104 S.W.3d 386

Supreme Court of Arkansas
Opinion delivered April 17, 2003

[Petition for rehearing denied May 8, 2003.

*John H. Bradley*, public defender, for appellant.

*Mike Bebee*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Jimmy R. Smart appeals his conviction and life sentence for the October 27, 2000, capital

murder of Manila resident C.B. Murphy.[1] Smart raises three arguments, none of which has merit.

Smart's first argument on appeal is that the trial court erred in denying his motion to suppress the statement he gave to police officers. Although Smart does not contend the evidence was insufficient to support his conviction, we must first briefly discuss the facts leading to his arrest and the statement. Murphy was murdered on October 27, 2000, and his body was discovered the morning of the following day — Saturday, October 28. That Saturday afternoon, a friend called Smart to say the police were looking for Smart and several other people who had been partying the night before in the trailer park where Murphy lived. Shortly before 3:00 p.m., Smart arrived on his own at the Manila Police Department. Once there, Smart spoke with Mississippi County Sheriff's Department Investigator Robert Ephlin, who advised Smart of his *Miranda* rights. Smart executed the *Miranda* rights form at 2:55 p.m., stating that he understood what his rights were and that he was willing to answer questions and make a statement. Smart did not request an attorney, but instead proceeded to give a statement denying any involvement in the murder.

Ephlin testified at the suppression hearing that, at this time, Smart was free to go, but Smart stayed at the police station. A short while later, Ephlin decided that he wanted to question Smart again, and so he again went over the *Miranda* form with Smart. However, Smart indicated that he thought he might need an attorney, so Ephlin terminated the interview. At that point, Ephlin said, Smart was still not under arrest and was still free to leave the building. Ephlin and Chief of Police Jackie Hill left the room to talk.

After a few minutes, Smart came to the door and indicated that he wanted to talk to Ephlin again, saying, "Bobby, would you come back and talk to me? Let's get this over with." Ephlin and Hill went back into the room with Smart, and Ephlin again read Smart the *Miranda* rights form. Smart initialed and signed the form, and proceeded to give a videotaped statement, during which Smart acknowledged that he had initiated the contact with the officers. Ephlin asked Smart if he wanted to take a polygraph

---

[1] Smart was also convicted of burglary, but does not challenge that conviction on appeal.

test, and Smart replied that he did. Smart continued to deny any involvement in the murder.

About 8:30 p.m., Ephlin called Lieutenant Bobby Walker with the State Police and arranged for a polygraph with State Police Detective Charlie Beall; Ephlin and Beall agreed to meet at Troop C Headquarters in Jonesboro. During the interval between the videotaped statement and Ephlin's calling the State Police, Smart was fed a cheeseburger and fries, and was allowed to take a nap on a cot in an unlocked holding cell at the police station. Ephlin testified that, during this interval, Smart was still free to leave at any time.

During the drive from Manila to Jonesboro, Smart was hand-cuffed, but Ephlin asserted that this was due to his lack of knowledge of whether Smart may have been involved in a brutal crime. The police car in which they were driving did not have a screen between the driver and the passenger in the rear seat, so Ephlin cuffed Smart's hands in front of him as a security measure. Ephlin averred that Smart was still not under arrest at this time, and the cuffs were removed when they arrived in Jonesboro.

Detective Beall conducted a polygraph examination of Smart after advising Smart of his *Miranda* rights; Smart once more initialed and signed the waiver of rights form at 9:30 p.m. The polygraph examination lasted about an hour and forty-five minutes. After the polygraph, Beall took a tape-recorded statement from Smart, again orally advising him of his rights and securing his agreement that he understood his rights. Beall testified that he did not coerce, threaten, or promise Smart anything, that Smart never requested an attorney, and that Smart did not appear to be under the influence of drugs or alcohol. During the taped statement, which lasted from 12:30 a.m. until 12:51 a.m., Smart confessed to killing Murphy. At that time, Smart was formally placed under arrest.

At the suppression hearing, Smart argued that his confession was obtained after he was "unconstitutionally detained," and that the detention was effected without probable or reasonable cause to suspect that he had participated in the murder. As evidence of the detention, Smart pointed to the fact that he remained in the Manila police station from 3:00 in the afternoon until 7:00 that evening. As proof that he was not free to leave the police station, he pointed to the fact that he did not leave, but stayed in the

police station and waited. Finally, Smart argued that the "most telling" evidence of his detention was the fact that the officers placed him in the backseat of a police car, in handcuffs, to take him to Jonesboro.

The trial court denied the motion to suppress, finding that Smart had voluntarily gone to the police department, and never asked to leave. The court ruled that the length of time Smart was there was not unreasonable, and that the officers had treated him well — feeding him and giving him a place to nap — while he was there. The court further found that the nature of the restraint with the handcuffs was reasonable, and that Smart consented to going to Jonesboro, and did so with the understanding that it would take some time to drive there.

Smart continues his arguments on appeal, maintaining that, because his inculpatory statement was given after an extended period of detention, his statement should have been suppressed. He cites *Shields v. State*, 348 Ark. 7, 70 S.W.3d 392 (2002), and *Friend v. State*, 315 Ark. 143, 865 S.W.2d 275 (1993), in support of his argument. In *Shields*, appellant Darwin Shields had been approached by police officers in regard to the disappearance of Shields's girlfriend, but when the police discovered suspicious items in Shields's car, they asked him to go to the police station for further questioning. Once there, Shields confessed to having murdered his girlfriend. On appeal, Shields argued that his confession should have been suppressed because the police should have made it clear to him that he was under no legal obligation to accompany them to the police station. This court rejected Shields's contention, holding that a verbal admonition of a suspect's freedom to leave was but "one factor to be considered in our analysis of the total circumstances surrounding compliance with [Ark. R. Crim. P.] 2.3." *Shields*, 348 Ark. at 11-12. We further cited *United States v. Mendenhall*, 446 U.S. 544 (1980), where the Supreme Court discussed whether a person's consent to accompany police officers is voluntary or is the product of duress or coercion. Stating that such a determination is to be made in light of the totality of the circumstances, the *Mendenhall* court held that "a person has been '*seized*' within the meaning of the Fourth Amendment *only if*, in view of all of the circumstances surrounding the incident, *a reasonable person would have believed that he was not free to leave.*" *Mendenhall*, 446 U.S. at 554-55 (emphasis added). Because Shields conceded that he went voluntarily to the

police station, this court rejected his argument that he had been illegally seized.

Shields raised an alternative argument that he had been arrested without probable cause, pointing to the fact that he had been handcuffed while being transported to the police station. This court likewise dismissed that argument, pointing out that the officer who handcuffed Shields informed him that such action was police department policy, and that Shields acknowledged that he understood this. We also held that our decision did not turn on the question of the handcuffing, stating that the question of whether a confession was the product of a free will is to be answered under the facts of each case, although no single fact is dispositive. *Id.* at 15. Examining the totality of the circumstances, which included Shields's repeated agreements that he was at the police station voluntarily, the court held that, even if Shields had been arrested illegally, his confession was still voluntary. *Id.* at 17.

■ In addition to the *Shields* case, Smart relies on *Friend v. State, supra,* wherein this court reversed a conviction on the basis that appellant Friend had been illegally arrested. That case is factually distinguishable from the present case, in that Friend's arrest was effectuated by Garland County officers, when those officers had only been asked to hold Friend until Sevier County officials could arrive to arrest him. In addition, the *Friend* case involved the improper use of a prosecutor's subpoena to obtain Friend's cooperation with questioning; the court held that the subpoena was illegally used "to subvert the requirements applicable to investigative stops." *Friend,* 315 Ark. at 152. No such concerns are implicated in the instant case, and Smart's attempts to analogize his situation to that in *Friend* are unavailing.

■ Likewise, Smart's reliance on *Shields* is misplaced, as it is apparent that his confession was not the result of an illegal arrest or other improper police activity. Smart appeared at the police station on his own volition. He initialed no less than four *Miranda* forms; on the second one, when he indicated that he though he might need an attorney, Ephlin immediately terminated the interview. Although two officers were present during the interview, there was no evidence that they displayed weapons, acted in a threatening or coercive manner in any respect, or indicated in any way that Smart could not leave. In fact, during Smart's confession, Detective Beall asked Smart, "I have never told you that you

couldn't leave here . . . uh, is that correct?" Smart replied, "Yes, sir." The officers fed Smart, and they gave him a place to lie down and nap. Although the officers conceded that they did not inform Smart that he was free to leave, Smart himself never testified that he tried to leave or that he believed that he would not have been able to leave the police station if he had tried.

■ ■ As the State points out, the only act by the police that actively interfered with Smart's freedom was when the officers handcuffed Smart and placed him in the back seat of the police car for the drive from Manila to Jonesboro. However, Smart who had had previous encounters with law enforcement officers, voluntarily agreed to go to Jonesboro for the polygraph test. Ephlin testified that the only reason he handcuffed Smart was because Ephlin did not know at the time whether Smart had been involved in a brutal murder. Further, Smart was uncuffed as soon as they got to Jonesboro; Detective Beall testified that Smart was not wearing handcuffs when he arrived inside the State Police Headquarters. This was a temporary and reasonable precaution on the part of the officers. In addition, Smart was again advised of his *Miranda* rights prior to speaking to Beall and giving his confession some three hours after the handcuffs were removed. Coercive police activity is a necessary component of an involuntary statement, and there must be an essential link between the coercive behavior of the police and the resulting confession of the accused for suppression to occur. *Hill v. State*, 344 Ark. 216, 40 S.W.3d 751 (2001). Given the totality of the circumstances, it is apparent that the trial court did not err in denying Smart's motion to suppress.

For his second point on appeal, Smart argues that the trial court erred in admitting crime scene and autopsy photographs, and he asserts that these photos were inflammatory and more prejudicial than probative. Smart specifically questions the admissibility of State's Exhibits 17, 18, and 19, displaying the body at the crime scene, and State's Exhibits 37 through 53, which were photographs taken by the medical examiner during the course of the autopsy on Murphy.

■ The controlling rule of evidence is Ark. R. Evid. 403, which states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presenta-

tion of cumulative evidence." The admissibility of photographs lies in the sound discretion of the trial judge and will not be reversed absent an abuse of discretion. *Mosby v. State*, 350 Ark. 90, 85 S.W.3d 500 (2002); *Hamilton v. State*, 348 Ark. 532, 74 S.W.3d 615 (2002).

This court has repeatedly stated that when photographs are helpful to explain testimony, they are ordinarily admissible. *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001); *Williams v. State*, 322 Ark. 38, 907 S.W.2d 120 (1995). Further, the mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient reason to exclude it. *Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994). Even the most gruesome photographs may be admissible if they assist the trier of fact by shedding light on some issue, proving a necessary element of the case, enabling a witness to testify more effectively, corroborating testimony, or enabling jurors to better understand the testimony. *Barnes, supra*. Other acceptable purposes are to show the condition of the victim's body, the probable type or location of the injuries, and the position in which the body was discovered. *Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000); *Sanders v. State*, 340 Ark. 163, 8 S.W.3d 520 (2000). Pictures may also be helpful to the jury by showing the nature and extent of wounds and the savagery of the attack on the victim. *Bradford v. State*, 306 Ark. 590, 815 S.W.2d 947 (1991).

The trial court must exercise some discretion in its decision-making regarding the admissibility of photographs. *Mosby, supra*. Stated differently, the trial court cannot simply give *carte blanche* to the admission of any and all photographs of the crime scene and victim offered by the prosecutor, as that would be a failure to exercise discretion. *Id.* (citing *Berry v. State*, 290 Ark. 223, 718 S.W.2d 447 (1986)).

Here, the trial court reviewed eleven photographs of the crime scene, but permitted the State to introduce only three of them, opining that they were "probably . . . the lesser offensive of the eleven that you've shown me." The court noted that the three photos that were admitted into evidence "depict the body with a weapon, [and] they also display and depict the crime scene and the location of the weapons, and therefore, are probative to that issue, and even though they aren't the prettiest things to look at,

I've seen worse." Clearly, the trial court exercised its discretion in determining which pictures should be admitted.

Smart also argues that the photographs were cumulative to the crime scene videotape that the State also introduced. However, this court has held that videotapes can give the jury a different perspective of the crime scene, and in that way, they can be helpful to a jury's understanding of the case. *Hamilton v. State*, 348 Ark. 532, 74 S.W.3d 615 (2002). In *Hamilton*, this court stated that, "[c]ertainly, the crime scene was bloody and gruesome, but whether the prosecutor overstepped his bounds in the submission of cumulative depictions is a matter that lies within the trial court's discretion." *Hamilton*, 348 Ark. at 541.

Further, Smart contends that the autopsy photographs were gruesome and unfairly prejudicial. The State introduced seventeen photos from the autopsy; these pictures showed various wounds on Murphy's body, including numerous shots of the back of his head both before and after the medical examiner shaved his hair to better examine the extent of the crushing blows to the back of Murphy's skull. Other photos showed the stab wounds to Murphy's torso and back, and one defensive-type cutting wound on his wrist. Dr. Frank Peretti, the medical examiner, described the cluster of stab wounds on Murphy's chest as coming from two different implements and as being consistent with "a lack of struggle on the victim's part. The person is unconscious or in the process of dying." As photographs may be utilized to demonstrate the "savagery of the attack on the victim," *see Bradford, supra*, and to corroborate the medical examiner's testimony, *see Mosby, supra*, we hold the trial court did not abuse its discretion in admitting these pictures.

Finally, Smart argues that the fact of Murphy's murder and the cause of his death were undisputed, and that it was prejudicial to parade gruesome photographs before the jury. A defendant, however, cannot prevent the admission of a photograph merely by conceding the facts portrayed therein. *Sanders v. State, supra*. Therefore, this argument is also without merit.

Smart's final argument is that the trial court erred in denying his motion for new trial. The decision whether to grant or deny a new trial lies within the sound discretion of the trial court, and this court will reverse that decision only if there is

a manifest abuse of discretion. *Henderson v. State*, 349 Ark. 701, 80 S.W.3d 374 (2002). A trial court's factual determinations on a motion for a new trial will not be reversed unless clearly erroneous, and the issue of witness credibility is for the trial judge to weigh and assess. *Id.*

Smart filed his motion for new trial after a Mrs. Sue Yarbrough advised his attorney that she might have additional information about the case. Yarbrough alleged that she had seen Murphy's body lying on the floor of his trailer at 6:30 a.m. on Friday, October 27, nearly twenty-four hours before police officers found his body. In his motion, Smart argued that the medical examiner had placed the time of death between 6:00 p.m. on Thursday night, October 26, 2000, and early Saturday morning on October 28, 2000. Yarbrough's evidence, he claimed, placed the time of death prior to early Friday morning, instead of Friday night, which, he argued, would have had a bearing on his defense and the jury's conviction of him.

Following a hearing, the trial court denied Smart's motion, noting first that Yarbrough's testimony about where she had seen the body conflicted with the trial testimony of the investigating officers, who had found Murphy at the opposite end of the trailer. In addition, the court stated that Yarbrough's testimony did not conflict with the range for the time of death given by the medical examiner. Finally, pointing out that Yarbrough described no physical injuries and claimed to have seen no evidence of blood or trauma, and that she had kept silent for over a year and a half after Murphy's murder, the court concluded that it did not find her a credible witness.

 ██ The trial court did not abuse its discretion in refusing to consider this "newly discovered" evidence as requiring a new trial. We have long held that newly discovered evidence is one of the least favored grounds to justify a new trial. *Hicks v. State*, 327 Ark. 652, 941 S.W.2d 387 (1997); *Bennett v. State*, 307 Ark. 400, 821 S.W.2d 13 (1991); *Williams v. State*, 252 Ark. 1289, 482 S.W.2d 810 (1972). Here, Yarbrough testified that she did not see any blood on Murphy, even though crime scene photographs clearly showed the presence of blood covering Murphy. In addition, Yarbrough claimed to have seen Murphy's body at the opposite end of the house from where the police found his body. Lastly, Yarbrough never offered her story until her daughter, who attended

Smart's trial, told Yarbrough that she thought Smart was innocent. Clearly, in view of these inconsistencies, the trial court's determination that Yarbrough was not credible was well-founded, and accordingly, we conclude the trial court's ruling denying Smart's motion for new trial did not amount to an abuse of discretion.

The record in this case has been reviewed for other reversible error in accordance with Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.