Joel Brian HOLLOWAY  *v.*  STATE of Arkansas

CR 04-555                                213 S.W.3d 633

Supreme Court of Arkansas
Opinion delivered September 22, 2005

[Rehearing denied October 27, 2005.]

*The Rees Law Firm,* by: *David Rees,* for appellant.

*Mike Beebe,* Att'y Gen., by: *David R. Raupp,* Sr. Ass't Att'y Gen and *Kent G. Holt,* Ass't Att'y Gen, for appellee.

JIM HANNAH, Chief Justice. Appellant Joel Holloway appeals from his conviction of capital murder for the shooting death of his cousin's wife Tracy Holloway, for which the appellant was sentenced to life in prison without the possibility of parole. The appellant raises five points on appeal. He argues that the circuit court erred in: (1) failing to suppress involuntary statements given to the police; (2) denying his motion for new trial after receiving evidence that the verdict was the result of undue influence and juror misconduct; (3) allowing expert testimony by the medical examiner on the effects of methamphetamine; (4) permitting the cross-examination of an expert beyond the scope of direct examination; and (5) permitting the introduction of a videotape and photographs that were inflammatory and prejudicial. We find no error and, accordingly, we affirm. Our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2).

*Facts*

On October 13, 2002, Officers Wes Baxter and Matt Cossey, deputies with the Craighead County Sheriff's Office, responded to a 911 call regarding a shooting at the residence of Tracy and Tim Holloway, located at 12 County Road 465, in Jonesboro. When the officers arrived at the scene, they observed the appellant

lying in the driveway holding his right leg and Tim standing near the house with a gun in his hand. Tim then placed the gun on the driveway, backed away, and put his hands up. Officer Baxter stated that he asked Tim what happened, and that Tim pointed to the appellant and said, "[H]e killed my wife." Officer Baxter entered the house through a door that was partially open. Upon entering the house, he discovered a woman lying in a pool of blood.

. Officer Baxter walked back outside and advised Tim and the appellant of their rights, and he again asked Tim what had happened. Tim said that he shot the appellant in the leg because the appellant was coming after him. Officer Baxter then asked the appellant what had happened. In response, the appellant said that Tracy blasphemed God, so he shot her seven times.

Paramedics arrived at the scene and transported the appellant to the emergency room. Within a few minutes of the ambulance's departure, Officer Cossey left for the hospital. He testified that at the hospital, a nurse administered "some kind of pain shot and put something in the IV for pain." When the nurse left, Officer Cossey began taking the appellant's statement. In his statement to Officer Cossey, the appellant admitted he had recently smoked marijuana and used crystal methamphetamine.

The State charged the appellant with capital murder. The case proceeded to trial and, on October 10, 2003, the jury found the appellant guilty of capital murder. On October 27, 2003, the circuit court heard the appellant's motion for a new trial, wherein the appellant argued that the verdict was the result of undue influence and juror misconduct. The circuit court denied the motion. The appellant now brings this appeal.

### Motion to Suppress

The appellant argues that the circuit court erred in failing to suppress statements he alleges were involuntary. Two statements are at issue: (1) the appellant's statement given to Officer Baxter at the crime scene, and (2) the appellant's statement given to Officer Cossey at the hospital.

■■ In reviewing a circuit court's refusal to suppress a confession, we make an independent determination based upon the totality of the circumstances. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003), *cert. denied*, 540 U.S. 967 (2003); *Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001). A statement made while in

custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Jones v. State*, 344 Ark. 682, 42 S.W.3d 536 (2001). In order to determine whether a waiver of *Miranda* rights is voluntary, this court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* This court has consistently held that relevant factors in determining whether a confession was involuntary are age, education, and the intelligence of the accused as well as the lack of advice as to his constitutional rights, the length of detention, the repeated and prolonged nature of questioning, and the use of mental or physical punishment. *See, e.g., Pilcher v State*, 355 Ark. 369, 136 S.W.3d 766 (2003); *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998). Other relevant factors in considering the totality of the circumstances include the statements made by the interrogating officer and the vulnerability of the defendant. *Pilcher, supra*; *Hood v. State*, 329 Ark. 21, 947 S.W.2d 328 (1997).

■■ When an appellant claims that his confession was rendered involuntary because of drug or alcohol consumption, the level of his comprehension is a factual matter to be resolved by the circuit court. *Grillot, supra; Jones, supra.* In testing the voluntariness of one who claims intoxication at the time of waiving his rights and making a statement, this court determines whether the individual was of sufficient mental capacity to know what he was saying — capable of realizing the meaning of his statement — and that he was not suffering from any hallucinations or delusions. *Grillot, supra; Jones, supra. See also U.S. v. Harden*, 480 F.2d 649 (8th Cir. 1973) (stating that a confession made by a person under the influence of drugs is not per se involuntary).

We turn first to the appellant's argument regarding the statement given to Officer Baxter at the crime scene. The appellant argues that the circuit court erred in refusing to suppress this statement because he was screaming in pain from a gunshot wound to his leg when he spoke to Officer Baxter. Additionally, the appellant contends that at the time of the statement, "he might have been under the influence of narcotics." The appellant contends that his responses to Officer Baxter's questions would alert even an untrained observer that he was incapable of understanding what was happening to him, and that he was unable to comprehend the significance of the rights he was purporting to waive. A

transcript of the recorded conversation between Officer Baxter and the appellant at the crime scene reveals the following:

Q: . . . Sir, what's your name?

A: Joel Holloway.

Q: OK. Joel, listen to me, okay. You have the right to remain silent. Anything you say can and will be used against you in a court of law. OK. You have the right to talk to a lawyer and have him present with you while you are being questioned and if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, i[f] you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand, Joel?

A: Do you know Jesus Christ as your personal savior?

Q: Listen, do you understand your rights?

A: Do you know Jesus Christ?

Q: Yes, I know who he is. Do you understand your rights?

A: Do you know Jesus Christ as your personal savior?

Q: Joel, just listen to me, okay, do you understand your rights?

A: Do you know Jesus Christ as your personal savior?

Q: Yes, I do. Do you understand your rights?

A: Yes, I do.

Q: OK. Did you shoot her? Be honest with me, Joel. OK. I am just trying to figure out what happened here. Will you tell me, tell me your side of the story. Tell me what happened. Will you do that?

A: Honestly?

Q: Yes.

A: She blasphemed the name of the Holy God.

Q: OK.

A: And, the Holy Ghost.

Q: OK.

A: And I shot her.

Q: Why did you shoot her?

A: Because she blasphemed the Holy Ghost.

. . .

Q: Did you want to kill her or was you. . . ?

A: She blasphemed the name of God. I can't. I'm losing breath right now.

Q: OK.

A: I can't talk.

Q: Who shot you?

A: I am in too much pain.

. . .

The appellant next argues that his second statement, given to Officer Cossey at the hospital, should have been suppressed because the appellant made the statement at a time when he was under the influence of prescribed medication and suffering from a gunshot wound. Officer Cossey testified that he did not advise the appellant of his rights at the hospital, but that approximately twenty to thirty minutes prior to his questioning of the appellant at the hospital, he had witnessed Officer Baxter advise the appellant of his rights at the crime scene. The appellant contends that the officer continued to talk to him while he was screaming in pain and while the hospital staff was trying to insert a catheter. In his statement to Officer Cossey, the appellant admitted to smoking "weed this morning," and he also stated that he had not been to sleep for a week because he had been using crystal methamphet-

amine. The appellant argues that there can be little doubt that, at the time he made the statement, he was incapable of practicing a reasoned judgment as to whether to respond to police questioning, and could not, because of his physical and mental condition, voluntarily give a statement.

The circuit court had both of the recorded statements and transcribed texts before it at the suppression hearing. In addition, the circuit court also heard the testimony of Jeremy Drennon, a paramedic who responded to the 911 call along with Officers Baxter and Cossey. Drennon said that when his medical team first arrived, they walked past the appellant, who was sitting in the driveway and appeared not to be injured, until he called to them and told them he had a "femur fracture." Drennon also said that the appellant appeared to be extremely familiar with emergency medicine, describing to Drennon that his injury would require a "hair traction splint," and that the paramedics could get an IV started because he had a good "AC" (antecubital vein). He further testified that while en route to the hospital, the appellant conversed with him and asked him whether the ambulance service was hiring. Finally, Drennon stated that the appellant was given no medication at the crime scene or in the ambulance.

The State acknowledges that the appellant was experiencing pain resulting from the gunshot wound inflicted by his cousin and the subsequent medical procedures. Still, the State maintains that while the appellant appears to suggest that his pain was either too extreme or his religiosity too bizarre for police to attempt to question him, the testimony at the suppression hearing indicated that the police did not use pain as a tool or slow his treatment for the wound, nor were his remarks to the police a request to cease questioning. The State adds that the evidence of the appellant's directing of his own treatment and conversing with the staff of the ambulance service indicates that the appellant was not in so much pain that he could not think clearly.

■ The appellant attempts to analogize the instant case to *Mincey v. Arizona*, 437 U.S. 385 (1978); however, the State argues that the *Mincey* case is easily distinguishable. We agree. In that case, the police took a statement from Mincey while his condition was depressed almost to the point of coma. There, the appellant was in extreme pain and encumbered by tubes, needles, and breathing apparatus. Though in a debilitated and helpless condition, Mincey clearly expressed his wish not to be interrogated, writing: "This is all I can say without a lawyer." *Id.* at 399. Here, the only response

from the appellant that could be construed as a request that questioning stop would be when the appellant said, "I can't—I'm losing my breath now," when Officer Baxter asked the appellant who shot him. Even assuming this statement qualifies as a request to stop the questioning, the appellant did not make this statement until *after* he had already told Officer Baxter that he had shot Tracy.

■■ In the instant case, after hearing testimony at the suppression hearing, the circuit court found that the appellant had presented no evidence requiring the statement given to Officer Baxter be excluded. Additionally, the circuit found that the statement given to Officer Cossey was admissible and concluded that Officer Baxter's reading of *Miranda* rights to the appellant at the crime scene was sufficient to cover the interrogation that took place later at the hospital. We defer to the circuit court in its determination of credibility of witnesses in suppression matters. *See Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999). In addition, the determination of the extent of a defendant's impairment is an issue for the circuit court to resolve. *See id.* We cannot say that the circuit court's denial of the appellant's motion to suppress his statements was clearly against the preponderance of the evidence.

### Juror Misconduct

The appellant argues that the circuit court committed reversible error by denying his motion for new trial after receiving evidence that the verdict was the result of undue influence and juror misconduct. The appellant raises three issues for reversal on this point. First, he argues that the circuit court erred in denying his motion for new trial because one of the jurors was unduly coerced during jury deliberations due to her medical condition. Next, he argues that the circuit court erred in denying his motion for new trial because the jury engaged in improper communications prior to deliberation. Finally, he argues that the circuit court erred in failing to remove a juror for personal bias.

■ The decision on whether to grant or deny a motion for new trial lies within the sound discretion of the circuit court. *Henderson v. State*, 349 Ark. 701, 80 S.W.3d 374 (2002). We will reverse a circuit court's order granting or denying a motion for new trial only if there is a manifest abuse of discretion. *Id.* A circuit court's factual determination on a motion for new trial will not be reversed unless clearly erroneous. *Id.* This court has repeatedly

held that the issue of witness credibility is for the trial judge to weigh and assess. *Id.; Green v. State,* 334 Ark. 484, 978 S.W.2d 300 (1998). Accordingly, this court will defer to the superior position of the circuit court to evaluate the credibility of witnesses. *Henderson, supra; Humphrey v. State,* 327 Ark. 753, 940 S.W.2d 860 (1997).

Allegations of undue influence and juror misconduct came to light the Monday following the jury's verdict, which was rendered on Friday. In an affidavit attached to the motion for new trial, Juror Paxton alleged that as the jury began to deliberate after the close of the case, it became apparent to her that she was the sole juror that was convinced that the defendant suffered from mental disease or defect and should be acquitted.

Paxton testified that the bailiff told the jurors some time during the middle of the afternoon on the day of deliberations that they could not ask anymore questions. She stated that she understood the bailiff's statement to mean that if she had a question, she had to figure out the answer on her own. Paxton, a diabetic, also said that she believed that she was not free to get food or leave for medicine. She testified that the only reason she voted the way she did — guilty of capital murder, as opposed to not guilty by mental disease or defect — was because she felt that she was in a life-threatening situation and that the only way she could get out of the jury room and attend to her medical condition was to vote with the rest of the jurors. Paxton acknowledged that when she was polled by the clerk in open court, she did say that her verdict was guilty of capital murder. However, she said that at that time, she was still under duress from her medical condition, and that if she had not "gone with [the other jurors]," she "would have needed police protection."

Bailiff Erma Munns, who served during the appellant's trial, testified that she never told the jury that "there would be no more questions," and that they needed to stay and deliberate. Munns stated that she was aware that Paxton was a diabetic. Munns said that during a break in the trial, Paxton asked her if she could take a diet drink with her in the jury box. Munns allowed Paxton to take the drink with her, and she testified that she told Paxton: "If you have any problems, just let me know and I will get the judge's attention and we can take a break." According to Munns, Paxton never complained during the course of the trial about her condi-

tion. Further, Munns stated that she announced to the jury that if any of them felt sick, there was an alternate juror to take his or her place.

Paxton also testified that during a break in the trial, she spoke to a fellow juror, who was eventually elected jury foreperson, and that the foreperson "said she had it all figured out and it wasn't going to take very long, he was guilty." Paxton testified that the foreperson's comments did not affect her opinion and that she "tried to wait until the end to draw [her] conclusion."

At the conclusion of the hearing, the circuit court made the following findings:

> I must confess that I had some difficulty with the idea that anyone sitting on a jury of mine would believe that I would sit and do nothing in the face of a juror's medical emergency because there are options available to us. I could have made provisions for her to go get food and we could have waited for her until she returned. That was an option. We could have had food brought to her, as we had done previously, we had lunch brought here. Also considering Mr. Copelin's recollection, we did have a break during the. . . closing arguments as I recall. . . . [A]lso, we could have replaced this juror with the alternate who was sitting over there in this room to the side twiddling her thumbs while the other jurors deliberated.

> To address the . . . comments made by the bailiff to her, I don't find there was anything that the bailiff told her that would have reason to have lead her to the conclusion that she was a prisoner in the jury room.

> . . . Any influence that came to bear on Ms. Paxton was not the result of any improper acts or omission on the part of anyone else. Any duress that she felt was one that she imposed on herself as a result of the misconception that she manufactured in her own mind and by her own admission took no measure to eradicate. Even the most serious of cases such as this one, the law does not insure perfection in its trials. We are all mortal and by definition are incapable of perfection. The only thing the law can insure is a fair trial and I'm convinced that Mr. Holloway received one.

. . .

The circuit court's findings were based on its assessment of the credibility of the witnesses. As the circuit court is in a superior position to evaluate the credibility of the witnesses, we

defer to the circuit court's assessment of the witnesses' testimony. We hold that the circuit court did not abuse its discretion in denying the appellant's motion for new trial on this issue. As to the allegation a juror communicated her opinion about the defendant's guilt to another juror prior to deliberations, the circuit court found:

> According to Ms. Paxton this statement was made only to her and that she was not influenced by it. That was wrong for this lady to have indicated her views on the murder case at all prior to the jury's retirement. However, the case law says that there must be a reasonable possibility of prejudice and here [there] was none because the only person who heard the comment stated that she was not affected by it in any way.

■■ Following allegations of juror misconduct, the moving party bears the burden of proving that a reasonable possibility of prejudice resulted from any such juror misconduct. *Butler v. State*, 349 Ark. 252, 82 S.W.3d 152 (2002). This court will not presume prejudice in such situations. *Id.* Jurors are presumed unbiased and qualified to serve, and the burden is on the appellant to show otherwise. *Id.* Whether prejudice occurred is a matter for the sound discretion of the circuit court. *Id.*

■ In the instant case, after hearing testimony from Paxton, the circuit court determined that any discussion among the jurors was isolated and did not even affect the juror involved. In light of this, the circuit court determined that there was no reasonable possibility of prejudice. We conclude that the circuit court did not abuse its discretion.

The appellant next argues that the circuit court erred in failing to remove Juror Hickman for bias. During the course of the proceedings, it was discovered that Hickman was an acquaintance of the decedent's cousin, Barbara Nelson. The following colloquy took place between the circuit court and Hickman:

> THE COURT: Tell me about that exchange that took place. That was this morning, right?
>
> HICKMAN: Yes, it's after noon. I mentioned — said hi, and no words were exchanged. We heyed, and I asked how are your kids, and went from there. I said I don't

want to know anything. I'm on the jury, I don't want to know anything, how are your kids?

THE COURT: Who's this acquaintance?

HICKMAN: Barbara Nelson, is that who you're talking about?

THE COURT: Barbara Nelson, well, that's — okay. How long has it been since you've seen her before this morning?

HICKMAN: Uh, I saw her when they were choosing the jury, and I come up here and told you at that time that I knew her. And I had not seen her in. . . .

THE COURT: . . . . I think I remember that . . .

HICKMAN: . . . or associated with her in two or three years. And I said we're still friends, you know, we haven't talked, but we're still friends. That's what I told you at that time.

. . .

HICKMAN: . . . And when I spoke with the judge before, he asked if it would affect any decision I'd made. And I said no, and to this day it still doesn't make any difference.

. . .

Later, defense counsel renewed his motion to disqualify Hickman. The circuit court stated, "I. . . asked a number of questions of that juror and gave the attorneys the opportunity to do the same and I'm satisfied that she's not biased and I'm not gonna strike her from this jury." On appeal, the appellant contends that the circuit court erred in denying his motion for new trial because of Hickman's alleged bias; however, as the State points out, the appellant's argument with respect to Hickman was not made as part of his motion for a new trial. Rather, the appellant points to *pre-verdict* rulings as to his complaints on this purported *new-trial* claim. Because this issue was not preserved for appeal, we do not consider it.

In sum, the circuit court did not abuse its discretion in denying the appellant's motion for new trial based on allegations of undue influence and juror misconduct. After hearing testimony and assessing the credibility of witnesses, the circuit court determined that a new trial was unnecessary. We find no abuse of discretion.

### Expert Testimony on Methamphetamine

The appellant next argues that the circuit court committed error by allowing expert testimony by Dr. Charles Kokes, the medical examiner who performed the autopsy on the decedent, concerning how the use of methamphetamine affects a person's conduct. The appellant states that Dr. Kokes was not qualified to testify about the effects of methamphetamine, nor did he ever examine the appellant. He contends that the State did not provide discovery to the defense of Dr. Kokes's status as an expert on the effects of methamphetamine or its plans to ask him to testify as such.

The State argues that the appellant is not entitled to relief because he agreed with the circuit court that permitting him to cross-examine Dr. Kokes the following Monday would satisfy his concerns about the subject of the testimony — the effects of methamphetamine — into which the State was inquiring. We agree, and we note that the appellant does not dispute that he agreed to cross-examine Dr. Kokes on this issue the following Monday. A party cannot complain on appeal about relief to which he agreed or sought. See Grillot, 353 Ark. at 316, 107 S.W.3d at 149.

### Cross-Examination

The appellant argues that the circuit court erred in permitting the cross-examination of an expert beyond the scope of the direct examination. As part of its case in chief, the defense called to the stand Donald Birmingham, a clinical psychologist. The appellant, at age ten, was evaluated by Dr. Birmingham. Dr. Birmingham testified that his evaluation of the appellant led to two possibilities: that the appellant had a learning disability or was suffering from emotional immaturity. He further testified that at the time of his evaluation, he formed an impression that the appellant's emotional disturbances could lead to psychosis.

On recross-examination, Dr. Birmingham testified that he had not treated or counseled drug abusers or addicts, but he was

aware that psychosis can be induced by methamphetamine abuse. The prosecutor then asked Dr. Birmingham about the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM-IV). The appellant objected on the basis that the question was beyond the scope of direct examination. The appellant stated that Dr. Birmingham was called only to testify concerning his opinion based on the examination he had conducted many years earlier and that he did not testify about the future. The circuit court responded that the appellant had asked if the findings of 1984 could be predictive of future psychosis.

The appellant then argued that he had asked Dr. Birmingham nothing about conduct related to drugs. The prosecutor explained that, in light of Dr. Birmingham's opinion that a slight learning disability could be a factor suggesting future psychosis, he wanted to know if, under the DSM-IV, chronic drug abuse could also be a factor that leads to psychosis. The circuit court ruled that it would allow the question. Dr. Birmingham then testified that chronic abuse of methamphetamine is listed in the DSM-IV as something that can cause psychotic disorders.

Rule 611(b) of the Arkansas Rules of Evidence provides:

> Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

This court reviews matters concerning the scope of cross-examination under an abuse-of-discretion standard. *Rodgers v. State*, 360 Ark. 24, 199 S.W.3d 625 (2004). We have stated that the use of cross-examination is an important tool in bringing the facts before the jury and that wide latitude should be afforded by the trial court. *Id.* That being said, this court has also held that a circuit court must determine when the matter has been sufficiently developed and when the outer limits of cross examination have been reached, and unless the trial court's discretion has been abused, this court will not reverse. *Id.*

In this case, the circuit court allowed the State to cross-examine Dr. Birmingham for the purpose of clarifying for the jury that things other than a learning disability or emotional

immaturity, such as drug abuse, could also lead to psychosis. We find no abuse of discretion, and we will not reverse the circuit court on this point.

### Photographs

■ This court has repeatedly stated that when photographs are helpful to explain testimony, they are ordinarily admissible. *Smart v. State*, 352 Ark. 522, 104 S.W.3d 386 (2003); *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001); *Williams v. State*, 322 Ark. 38, 907 S.W.2d 120 (1995). Further, the mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient evidence to exclude it. *Smart, supra; Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994). Even the most gruesome photographs may be admissible if they assist the trier of fact by shedding light on some issue, proving a necessary element of the case, enabling a witness to testify more effectively, corroborating testimony, or enabling jurors to better understand the testimony. *Smart, supra; Barnes, supra*. Other acceptable purposes are to show the condition of the victim's body, the probable type or location of the injuries, and the position in which the body was discovered. *Smart, supra*. Pictures may also be helpful to the jury by showing the nature and extent of wounds and the savagery of the attack on the victim. *Id.; Bradford v. State*, 306 Ark. 590, 815 S.W.2d 947 (1991).

The appellant objects to four photographs introduced by the State at trial. All four photographs are pictures of the victim's dead body. Two pictures were taken at the crime scene, and two pictures were taken during autopsy. The appellant further objects to a videotape of the crime scene.

The appellant contends that the circuit court erred in admitting the photographs and videotape offered by the State because they served no purpose other than to inflame the passions of the jury. The appellant states that the photographs were irrelevant to the facts and introduced despite the fact that there was never an issue regarding who shot Tracy. Similarly, the appellant argues that the circuit court erred in admitting the videotape, which included images of the victim's dead body, a Bible, and Christian literature with a bullet hole. The appellant maintains that there was nothing to be gained from viewing the video, that it did not shed light on any issue, corroborate testimony, or provide evidence of a necessary element of a case.

The State argues that the photographs were carefully considered by the circuit court, and that the appellant's admission to shooting the victim did not compel their exclusion. The State contends that each photograph was useful to show the crime scene and the victim's wounds. As for the videotape, the State contends that it helped illustrate the crime scene, the circumstances of the killing, and *res gestae*, generally.

It appears that the appellant believes that he may prevent the admission of photographs by stipulating to the facts surrounding a crime. The appellant is mistaken. A defendant cannot prevent the State from offering proof simply by conceding a fact. *See, e.g., Baker v. State*, 334 Ark. 330, 974 S.W.2d 474 (1998). We hold that the circuit court did not abuse its discretion in admitting the photographs and videotape at issue.

*4-3(h)*

In compliance with Ark. Sup. Ct. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant, and no prejudicial error has been found. *Doss v. State*, 351 Ark. 667, 97 S.W.3d 413 (2003).

Affirmed.