Cite as 2014 Ark. App. 349

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CR–13–164

| | |
|---|---|
| CHRISTOPHER CLARK<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered** June 4, 2014<br><br>APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT<br>[NO. CR–2012-68-1]<br><br>HONORABLE BERLIN C. JONES, JUDGE<br><br>AFFIRMED |

## BILL H. WALMSLEY, Judge

A Jefferson County jury found appellant Christopher Clark guilty of aggravated robbery, and he was sentenced as a habitual offender to an aggregate term of twenty years in prison. His sole point on appeal is that the trial court erred in denying his motion to suppress incriminating statements.[1] We affirm.

The evidence reveals that the following events happened on the evening of December 21, 2011. Clark entered a gas station owned by Raed Qatoum and attempted to purchase a 40 oz. can of beer. When it became apparent that Clark did not have enough money, Qatoum suggested that Clark buy the 22 oz. can, but Clark refused, saying that he "needed his beer." Qatoum took the can of beer from Clark and told him to leave. About thirty

---

[1]This case was originally brought as a no-merit appeal, and this court remanded to supplement the record and ordered rebriefing. *Clark v. State*, 2014 Ark. App. 27.

SLIP OPINION

minutes later, Clark returned to the gas station with a gun. Clark threatened to kill Qatoum and told him to hand over the money. Clark pulled the trigger, but nothing happened. Clark went around the counter, stuck the gun to Qatoum's chest, and pulled the trigger a second time. Again, the gun did not fire. Qatoum wrestled with Clark over the gun, eventually got it away from him, and held him until the police arrived.

Clark was taken into custody, and he made incriminating statements during a recorded interview with police:

> [MICHAEL ROBERTS]: I am Detective Roberts with the Pine Bluff Police Department, Today's date is December 21st, 2011 the time now is 9:12pm. I will be interviewing Mr. Christopher Clark. Mr. Clark can you state your name and date of birth for the record please.
>
> [CHRISTOPHER CLARK]: Christopher Clark, October 3rd, 1972[.]
>
> [MICHAEL ROBERTS]: Mr. Clark, I am investigating the incident that happened up there at uh the Speedway on Walnut. Can you tell me what happened?
>
> [CHRISTOPHER CLARK]: Yes, I sure can I went up there the first time I purchased some cigarettes and a bottle of beer uhm he talked so bad to me I had to come back I didn't need to come back but I come back. When I come back I come back with a vengeance. When I came back with this vengeance of mine, I was talking shit first . . . ok . . . now the guy talk stuff back to me so I left out the store. So I come back (*cough*) with a little . . . with a . . . with a little pistol . . . which wasn't mine (*burp*) . . . which didn't have no shells in it . . . that I knew of so I come in there trying to intimidate the man with it. I done that I'm . . . I'm . . . I'm guilty of all of that. I'm guilty of all of that . . . you know but my intention wasn't to hurt him or nothing but the guy called me so many negros and so such an such and so such in such that it got into my feelings. That's why I came back with that my only objective was to go in there and take his beer to show him that I am a little better then you are. You talking that stuff, that mess but I'm going to take your beer. So as I went in there to try to take his beer the guy got a hold of me. When he got a hold of me I had the little roscoe. The roscoe I had wasn't suppose to have no shells in it, but if it had shells in it I didn't know. So that's my fault . . . you know . . . I did that. Whatever it may be . . . I did that bottom line . . . I did that I can't sugar coat it. I can't lie about I did that. My intention was not to hurt him but to show him I can come take your beer and I

ain't gonna be too many niggas and . . . and . . . and . . . and all this and the other bottom line. So uhm to it concern . . . who it may concern I did that so hey . . . not being fly or jazzy or nothing but my intentions was to go in there and get me some beer and come out of there and do what I needed to do but apparently the man rubbed me the wrong way therefore I took it to another level just like he did and uhm when I come in there with an empty . . . with a . . . with a . . . with an empty gun the man done wrestled me tussled me . . . whoop . . . whoop . . . whoop and done that. When he called the police the first time over the argument. He called the police the first time you know so I come there the second time you know maybe thirty five minutes later I come there the second time.

[MICHAEL ROBERTS]: Did you see the officer the first time?

[CHRISTOPHER CLARK]: Uh, the officer the first time I seen was uhm . . . the guy had a skull cap I don't know his name I know . . . it was a . . . it was a young fellow he had a black skull cap on he was very . . . very young new (*inaudible*)[.]

[MICHAEL ROBERTS]: Did he speak to you[?]

[CHRISTOPHER CLARK]: New (*inaudible*), I seen him he didn't see me[.]

[MICHAEL ROBERTS]: Ok[.]

[CHRISTOPHER CLARK]: See what I'm saying[?]

[MICHAEL ROBERTS]: Um hum[.]

[CHRISTOPHER CLARK]: Actually he drove past me as I walked behind Speedway (*cellular phone ringing*) across that vacant parking lot to those apartments over there. I see him he see me but he never caught me as a suspect you know what I'm talking about. I was even going to presume myself as a suspect so . . . but anyway . . . I went back in there with an old funny ass gun didn't know it had any shells in it (*cellular phone ringing*) a little punk ass twenty-two excuse me. The little bull jive twenty-two, excuse me and my intention was to show it and scare him the way he done me but apparently when I showed it to scare him he called the police on me. Now it wasn't no shots fired, my intentions wasn't to hurt him wasn't none of that. Cause the gun was suppose to be empty from my guy . . . my understanding and when I picked it up and seen it was empty from my understanding. What every the situation may be I done that. I did that, not bragging or boasting but I went in there to show this guy that you can't talk to me ignorant. So my ignorance got me in trouble. So there for I'm . . . what you see on the camera is really real but at the same time uhm my intentions was not to hurt the guy cause the guy was out to hurt me. So if I



incriminated myself maybe I did. If not I'm telling the truth so this is my . . . this is . . . this is . . . this is my story my name is Chris Clark born 10/03/72. This is my story . . . Thank you.

[MICHAEL ROBERTS]: The time now is 9:17pm and I am going to conclude the interview with Mr. Clark.

The State charged Clark with attempted first-degree murder and aggravated robbery.[2] Clark moved to suppress his confession, arguing that it was the result of false promises of leniency.

At the suppression hearing, Detective Roberts testified that he read Clark his *Miranda* rights, and Clark initialed beside each right indicating that he understood. Roberts testified that he usually confirms that the accused has been read his rights and understands them; however, Clark immediately began speaking, so Roberts simply began recording the interview. The transcript of Clark's interview was admitted into evidence.

Roberts recalled that Clark had indicated that he had a twelfth-grade education and that he did not question Clark's ability to understand. Roberts testified that he did not threaten Clark or promise him anything but that he did tell Clark that, because he had confessed, the prosecutor might offer a plea agreement.

Roberts testified that Clark did not appear to be intoxicated. Roberts was then asked whether Clark sounded intoxicated, and Roberts responded, "No. Not really." He did recall that Clark sounded hoarse but stated that what Clark said was clear. Roberts did not give Clark a breathalyzer test and did not ask Clark whether he was sober.

---

[2]The jury acquitted Clark of attempted first-degree murder but convicted him of aggravated robbery.

The recording of the police interview was played for the trial court, and the court found that Clark seemed to be totally cognizant of what he was doing. The court noted that Clark's speech was not slurred and that Clark gave no indication that he was unaware of what he was doing. The court also noted that Roberts did not question Clark's sobriety or test him for alcohol because there was no reason to believe that Clark was intoxicated.

When reviewing a trial court's decision on a motion to suppress, the appellate court makes an independent determination based on the totality of the circumstances and will not reverse unless the trial court's ruling was clearly against the preponderance of the evidence. *Washington v. State*, 2011 Ark. 372. Issues regarding the credibility of witnesses testifying at a suppression hearing are within the province of the trial court. *Id*. Any conflicts in testimony are for the trial court to resolve, as it is in a superior position to determine the credibility of the witnesses. *Id*.

A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). In order to determine whether a waiver of *Miranda* rights is voluntary, the reviewing court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id*. In determining whether a confession was voluntary, the reviewing court considers the following factors: age, education, and intelligence of the accused, lack of advice of his constitutional rights, length of detention, the repeated and prolonged nature of the questioning, or the use of physical punishment.

*Holloway v. State*, 363 Ark. 254, 213 S.W.3d 633 (2005).

On appeal, Clark argues that his confession was not knowingly and intelligently made because he was under the influence of alcohol at the time of the interview with Roberts. Clark points out that Roberts made "the less than definitive statement that Appellant 'did not appear' to be intoxicated." Clark argues that the victim testified at trial that Clark had come into his store in a drunken state every day for the previous two to three weeks. The victim also testified that he thought Clark was intoxicated on the day of the robbery. Clark maintains that the trial court erred in not suppressing his statements considering his "drinking history, the need for alcohol as reason for the confrontation, the lack of the recording of *Miranda* rights, the absence of any counsel, [and] the transcript giving indications of alcohol use at the interview."

When an appellant claims that his confession was rendered involuntary because of his drug or alcohol consumption, the level of his comprehension is a factual matter to be resolved by the trial court. *Jones v. State*, 344 Ark. 682, 42 S.W.3d 536 (2001). While the reviewing court makes a closer examination of the appellant's mental state, factual questions are left to the trial court as to whether the accused had sufficient capacity to waive his rights. *Id*. The test of voluntariness of one who claims intoxication at the time of waiving his rights and making a statement is whether the individual was of sufficient mental capacity to know what he was saying—capable of realizing the meaning of his statement—and that he was not suffering from any hallucinations or delusions. *Id*.

The trial court had the opportunity to hear the recording of the police interview and

was in the best position to determine whether Clark's statement was given of his own free will in spite of knowing the consequences. Further, the evidence showed that Clark had a twelfth-grade education; his statement was more of a narrative, without much questioning by Roberts; and the interview lasted only approximately five minutes. The trial court was entitled to believe Roberts's testimony that, prior to the recording of the interview, Clark had been read his *Miranda* rights and indicated that he understood those rights. The trial court could further believe Roberts's testimony that Clark did not appear to be intoxicated at the time of the interview. Although Clark refers to the victim's trial testimony, that testimony was not before the trial court at the suppression hearing.[3] Even if this court were to consider the victim's trial testimony, it would not be sufficient to render the trial court's conclusion that Clark made a knowing and intelligent waiver of his rights clearly erroneous in light of evidence presented at the suppression hearing that was more contemporaneous with the police interview.

Viewing the totality of the circumstances, we hold that Clark's confession was made voluntarily, knowingly, and intelligently. We cannot say that the trial court's denial of the motion to suppress was clearly against the preponderance of the evidence.

Affirmed.

HARRISON and WYNNE, JJ., agree.
*Gary W. Potts*, for appellant.
*Dustin McDaniel*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

---

[3] *See Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999) (suggesting in a footnote that trial testimony cannot be relied on for suppression purposes).