2012 Ark. App. 182

**Michael Arlie FEUGET, Appellant**

**v.**

**STATE of Arkansas, Appellee.**

**No. CA CR 11–890.**

Court of Appeals of Arkansas.

Feb. 29, 2012.

Jeffrey Marx Rosenzweig, Little Rock, for appellant.

Dustin McDaniel, Atty. Gen., by: Brad Newman, Little Rock, for appellee.

ROBERT J. GLADWIN, Judge.

Appellant Michael Feuget appeals his conviction on one of two charges of aggravated robbery, challenging the sufficiency of the evidence supporting the conviction. He also argues that the circuit court erred in denying his motion for a new trial based on inaccurate testimony by his psychiatrist. We affirm.

Appellant was charged with two counts of aggravated robbery, pursuant to Arkansas Code Annotated section 5–12–103 (Repl.2006), and theft of property, pursuant to Arkansas Code Annotated section 5–36–103 (Repl.2006), in connection with the robbery of Iberia Bank in Little Rock on January 15, 2010. At trial, appellant raised the affirmative defenses of mental disease or defect and involuntary intoxication. He was convicted and sentenced to a total of 180 months in the Arkansas Department of Correction pursuant to a judgment and commitment order entered on February 3, 2011. A denial of his February 8, 2011 motion for new trial was entered on March 9, 2011, and appellant filed a timely notice of appeal on March 10, 2011.

## I. Sufficiency of the Evidence [1]

A directed-verdict motion is a challenge to the sufficiency of the evidence. *Hutcheson v. State*, 92 Ark.App. 307, 213 S.W.3d 25 (2005). On appeal, this court reviews the evidence in the light most favorable to the State, considering only the evidence that supports the conviction. *Spight v. State*, 101 Ark.App. 400, 278 S.W.3d 599 (2008). This court will affirm a conviction if there is substantial evidence

to support it, which is evidence of sufficient force and character that it will compel a conclusion with reasonable certainty. *Id.* Because a criminal defendant's intent can seldom be proved by direct evidence, it must usually be inferred from the circumstances surrounding the crime. *Id.* Jurors are allowed to draw upon their common knowledge and experience to infer intent from the circumstances, and it is presumed that a person intends the natural and probable consequences of his or her acts. *Id.* Determinations of credibility are left to the jury. *Dunn v. State*, 371 Ark. 140, 264 S.W.3d 504 (2007). The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Id.*

Appellant was charged with two counts of aggravated robbery, one of Clint Horne, reflected in Count 1, and one of Stephen Long, reflected in Count 2. Appellant challenges the sufficiency of the evidence with regard to Count 2, arguing that he committed the physical act of robbing one person, bank employee Mr. Horne, and that a second employee, Mr. Long, merely saw what was going on and handed over money as well, although no threat was made to him. Appellant argues that this is insufficient to sustain a conviction for the aggravated robbery of Mr. Long.

We disagree. Robbery, under Arkansas Code Annotated section 5–12–102 (Repl. 2006), requires that, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person. Aggravated robbery, un-

---

[1] Although appellant raises this challenge to the sufficiency of the evidence as his second point on appeal, double-jeopardy concerns re-

quire us to initially address this claim. *Boldin v. State*, 373 Ark. 295, 283 S.W.3d 565 (2008).

der section 5–12–103(a)(2), introduces the weapon or serious physical injury component.

Appellant maintains that the evidence indicates that he did not threaten physical force on Mr. Long, as no threat was directed to Mr. Horne and Mr. Long jointly. He cites *Mitchell v. State*, 281 Ark. 112, 661 S.W.2d 390 (1983), in which the defendant was charged with four counts of aggravated robbery at a restaurant. He took items from the manager and two patrons. Two counts pertained to the manager, one involving his own property and one involving the restaurant. The supreme court set aside one of the two convictions for robbing the manager. Our supreme court explained:

> [U]nder prior law robbery consisted of the felonious taking of money or other valuable thing from the person of another by force or intimidation. That definition put the primary emphasis upon the taking of property. But the Code redefines robbery to shift the focus of the offense from the taking of property to the threat of physical harm to the victim. As the Commentary states: "One consequence of the definition is that the offense is complete when physical force is threatened; no transfer of property need take place." *Jarrett v. State*, 265 Ark. 662, 580 S.W.2d 460 (1979). Ownership is not a necessary element of proof for aggravated robbery. The aggravated robbery was complete with the threat of physical harm and the intent to commit theft. Therefore, the same proof was required for each of the counts of robbery involving Matthew Helfrich, and the entry of conviction on both counts is prohibited by Ark. Stat. Ann. § 41–105(1)(a) and (2)(a) (Repl. 1977).

*Id.* at 113–14, 661 S.W.2d at 391–92. Here, as in Mitchell, appellant notes that the threat against Mr. Horne just happened to be viewed by Mr. Long.

In cases where the accused makes no verbal representation that he is armed, the focus is on what the victim perceived concerning a deadly weapon. *See Clemmons v. State*, 303 Ark. 354, 796 S.W.2d 583 (1990). Mr. Long testified that he was the bank's branch manager and that he was behind the teller line when appellant came into the bank. Mr. Horne and Mary Millerd were also behind the teller line. When appellant came into the bank, he handed bags to both Mr. Horne and Ms. Millerd. Testimony indicated that Ms. Millerd "froze," and that Mr. Long got the bag from her and began putting money into it, along with the tracking device that later led the police to appellant. Mr. Long testified that he saw appellant pull up his shirt to show something to Mr. Horne. Although Mr. Long acknowledged that he did not see what appellant was showing to Mr. Horne, he said that he "felt like whatever he was showing ... probably wasn't something we wanted to deal with." Mr. Long said he felt threatened and believed that they should comply with whatever appellant wanted so appellant would leave as soon as possible.

Although Mr. Long admitted on cross-examination that he did not see the gun and that appellant did not verbally threaten him, those things are not required as elements of aggravated robbery. There is no requirement that the threat of physical harm be made directly or indirectly, only that physical force be immediately threatened, however that threat may be communicated. *Robinson v. State*, 317 Ark. 17, 875 S.W.2d 837 (1994); *Butler v. State*, 2011 Ark. App. 708, 2011 WL 5562805. Based on Mr. Long's testimony, the jury could infer that Mr. Long believed appellant was showing Mr. Horne some sort of weapon.

Also instructive is *Wheat v. State*, 297 Ark. 502, 503, 763 S.W.2d 79, 80 (1989), in which our supreme court stated:

> The evidence adduced at trial showed that petitioner who was armed with a pistol entered the pharmacy and forced the two clerks to lie on the floor while the pharmacist gathered the money and narcotics into a bag. Only the property of the pharmacy was taken and there was no effort made to take any personal property belonging to the pharmacist and clerks.

In *Wheat*, the supreme court concluded that the robbery was a single transaction, the intention of which was to commit theft of the pharmacy property and not three separate offenses. *Id.* Similar to *Wheat*, in this case, the only money that was taken was from the bank.

We hold, however, that this case is more similar to *Robinson, supra*, where the supreme court held that a threat directly made to a store clerk also included a customer who happened to be in harm's way, justifying Robinson's convictions for two counts of aggravated robbery. *Id.* at 24–25, 875 S.W.2d at 842. Even if appellant intended to show his gun only to Mr. Horne, the fact that Mr. Long was in a position to see appellant display something to Mr. Horne and to feel threatened by that action is sufficient to support appellant's conviction for committing aggravated robbery as to Mr. Long.

Likewise in *McKinzy v. State*, 313 Ark. 334, 853 S.W.2d 888 (1993), the appellant attempted to rob a Harvest Foods store as two employees were closing and leaving the store one evening. While he did physically threaten and assault both employees, he argued that he committed only one aggravated robbery instead of two because he sought only to take the store's money. The supreme court reiterated that robbery focuses on the threat of phys-ical harm to the victim and that one consequence of the definition is that the offense is complete when physical force is threatened; no transfer of property need take place. *Id; see also Robinson, supra,* and *Mitchell, supra.* The supreme court also stated, as it had in *Mitchell*, that for aggravated robbery, ownership is not an element of proof, and the offense is complete with the threat of physical harm and the intent to commit theft. Subsequently, in *McDaniel v. Norris*, 38 F.3d 385 (8th Cir. 1994), the Eighth Circuit Court of Appeals referenced both *Wheat* and *McKinzy*, although disposing of the appeal on procedural grounds. The court stated that "[u]nder Arkansas law, however, one commits aggravated robbery by threatening or using force to take property from another, even if the property did not belong to the victim, and even if the robbery attempt was unsuccessful." *McDaniel*, 38 F.3d at 386. This is precisely the scenario that occurred in the instant case; accordingly, we affirm.

## II. *Denial of Motion for New Trial*

The decision whether to grant or deny a motion for new trial lies within the sound discretion of the circuit court, and this court will reverse only if there is a manifest abuse of discretion. *Harrison v. State*, 371 Ark. 652, 269 S.W.3d 321 (2007). A circuit court's factual determinations on a motion for a new trial will not be reversed unless clearly erroneous, and that court determines issues of credibility. *Smart v. State*, 352 Ark. 522, 104 S.W.3d 386 (2003). A claim of newly discovered evidence is one of the least favored grounds to justify a new trial. *Id.*

At trial, appellant raised the affirmative defense of involuntary intoxication, pursuant to Arkansas Code Annotated section 5–2–207 (Repl.2006), claiming that his actions resulted from medications he was

taking at the direction of his psychiatrist.[2] Multiple "experts" were called to testify regarding this issue, including: (1) Dr. Bob Gale, a neuropsychiatrist; (2) Dr. Lisa Doguet from the Arkansas State Hospital; (3) Dr. Kim Light, a professor of pharmacology at the UAMS pharmacy school; and (4) Dr. Joe Bradley, appellant's previous treating psychiatrist. Dr. Bradley was called last, as a rebuttal witness by the State, and his testimony and the ensuing procedural issues are the primary focus of appellant's argument.

Dr. Bradley testified that he had treated appellant since November 2006 for attention deficit disorder (ADD) and depression. Dr. Bradley chronicled his treatment of appellant, including changes and dosage adjustments of appellant's medications. When Dr. Bradley saw appellant on December 2, 2009, appellant was taking 200 milligrams of Zoloft, although Dr. Bradley had prescribed only 100 milligrams. Appellant had increased the amount he was taking on his own when he felt the lesser dosage was not working. He also was taking Adderall, which he had been taking since January 2008. Finally, at the December 2009 visit, Dr. Bradley began appellant on Deplin, a folic-acid supplement that can help with the absorption of the chemicals in the other medications he was taking. Dr. Bradley gave appellant four sample bottles of Deplin, directing him to take one pill daily for four weeks. Dr. Bradley testified that he did not recall writing appellant a prescription for Deplin, but that he set an appointment for a month later so he could determine if the Deplin was having any effect on appellant's symptoms.

Dr. Bradley next saw appellant on January 6, 2010, less than two weeks before the robbery. Because appellant reported no benefit from the Deplin, Dr. Bradley testified that he recommended that he stop taking it. He continued appellant on the Zoloft and Adderall. Evidence indicated that, at that visit, appellant did not report any suicidal thoughts, issues with sleep, hallucinations, or psychotic symptoms. On cross-examination, when defense counsel asked Dr. Bradley if he would dispute that appellant had had a prescription for Deplin filled on January 7, 2010, Dr. Bradley replied that he *may* have given appellant a prescription along with the samples so that appellant could get more in case the medication worked but that he did not recall giving appellant a written prescription for that drug. Appellant then called appellant's wife, Mrs. Feuget, a nurse, as a surrebuttal witness to testify that, on January 7, 2010, she had filled at Walgreens a prescription for Deplin that appellant brought home from his appointment with Dr. Bradley the previous day.

The next day, after the jury began its deliberations, appellant moved for a mistrial based on Dr. Bradley's testimony that he had not written a prescription for Deplin. Appellant produced a prescription dated January 6, 2010, that he obtained from Walgreens showing that Dr. Bradley had, in fact, written a prescription for Deplin. The State replied that appellant had had ample time prior to trial to interview Dr. Bradley and find out what he was going to say. Moreover, Dr. Bradley had testified two days earlier, and appellant waited until after the testimony had ended to bring this matter to the circuit court's attention. The circuit court denied appellant's motion for a mistrial.

Following his conviction, appellant timely filed a motion for a new trial, pursuant to Arkansas Rule of Criminal Procedure

---

**2.** Appellant also asserted the affirmative defense of *mental disease or defect*, but the issue on appeal concerns only his separate defense of involuntary intoxication.

33.3 (2011). The basis of the motion was that appellant was prejudiced by Dr. Bradley's testimony that he did not recall writing appellant a prescription for Deplin because it gave the jury the impression that appellant was not taking Deplin pursuant to Dr. Bradley's direction after January 6, 2010. The motion asserted that the jury would have reached a different verdict, presumptively involuntary intoxication, if the original prescription had been found in time to be shown to the jury.

At a hearing on the new-trial motion, Dr. Bradley admitted that his records did indicate that he wrote the prescription for Deplin on January 6, 2010, instructing appellant to take one tablet daily and authorizing twelve refills. Dr. Bradley noted that the seven and a half milligrams of Deplin had only a minimal effect on appellant's depression and that, as of January 6, 2011, appellant had taken Deplin for a month without any difficulties or unusual side effects.

At the conclusion of the hearing, the circuit court denied appellant a new trial. The circuit court noted that appellant was not prejudiced because the jury was aware of his defense of involuntary intoxication and because appellant's wife testified that the prescription was obtained from Dr. Bradley and filled on January 6, 2010. Accordingly, the circuit court found there was no basis for a new trial.

We hold that the circuit court was within its discretion to deny appellant's motion for a new trial. Appellant's argument goes to the issue of whether his intoxication was involuntary, but there was ample evidence presented at trial for the jury to conclude that he was not intoxicated *at all*—either voluntarily or involuntarily. Aside from appellant's ability to plan and carry out the robbery in great detail, the medical evidence presented was conflicting as to whether appellant acted under the influence of the drugs he was taking. The jury was not bound to accept the opinion of *any expert,* and it was solely the jury's duty to resolve the conflicting expert testimony. *Navarro v. State,* 371 Ark. 179, 264 S.W.3d 530 (2007).

Appellant called Dr. Gale, a neuropsychiatrist, who opined that appellant was involuntarily intoxicated from the medications he was taking. He described appellant's desire to best John Dillinger's time as "delusional." Dr. Bradley disagreed that appellant was intoxicated. He explained that he had never heard of anyone being intoxicated from taking Zoloft, although he had heard of Adderall causing intoxication. Dr. Bradley also noted that appellant had taken both of those medications, along with Deplin, for several weeks before the robbery without exhibiting any unusual symptoms or behavior.

Dr. Doguet examined appellant at the Arkansas State Hospital following his arrest. She diagnosed him with intoxication and a mild bipolar disorder. Nonetheless, she testified that at the time of the robbery, he could appreciate the criminality of his conduct and conform his conduct to the requirements of the law. In reaching those conclusions, she pointed to the detail with which he had planned the robbery. His attempt to dispose of the tracking device and his attempt to conceal his identity showed that he understood that he was engaging in criminal conduct. His concealment of a gun and writing notes in his truck until customers had left the bank indicated that he could conform his conduct. Dr. Doguet said that appellant did not feel compelled to enter the bank and rob it without preparing to do so.

Dr. Light, a professor of pharmacology at the UAMS pharmacy school, testified that Deplin has no impact on the absorption of Zoloft. Dr. Light stated that he did not believe that appellant was intoxi-

cated from either Zoloft or Adderall. Appellant had been taking the same dosage of Adderall for months with no adverse problems and, thus, was "relatively stable" on that drug. Appellant began taking Zoloft in 1994 and had never reported any complications from it. For several weeks before the date of the bank robbery, he had been taking 200 milligrams of Zoloft and 60 milligrams of Adderall daily without any complaints, so, assuming he took those same dosages on the day of the robbery, there was no pattern to "support the idea that suddenly, on this particular day, he becomes intoxicated by these drugs." Dr. Light further explained that, from the time of the increase of the Zoloft dosage and the addition of Deplin in December, it would take one or two weeks to see if there would be an intoxication effect and that sudden intoxication six weeks later would be "very unlikely." Dr. Light testified that Deplin would not have any physiological or pharmacological effect on appellant unless he had had a severe folic-acid deficiency beforehand. Intoxication is a "function of dosage," Dr. Light explained, so any side effects or intoxication would occur within days after the dosage increase rather than six weeks later.

The evidence showed that appellant meticulously planned and executed the robbery. Appellant explained to the jury that he had seen a television program about John Dillinger that indicated that Dillinger could complete a bank robbery without bloodshed in one minute. Appellant decided that he could "beat" Dillinger by committing a bank robbery in just thirty seconds, and he set out to do just that. He drove his truck to the bank and parked it down the street, rather than in the bank parking lot. Elizabeth Outar testified that, on the day and at the time of the bank robbery, she saw a large black pickup truck parked in front of her house near the bank. The driver, who was wearing dark clothing, a black hat, and sunglasses, got out of the truck and appeared to be stretching, causing Ms. Outar to think he was preparing to exercise at nearby War Memorial Park. When the man began walking away, Ms. Outar noticed that he had left the truck's engine running.

Appellant testified that, as he was sitting in his truck, he practiced what he would say in the bank, to make sure it would take him no more than thirty seconds to make his demand and leave the bank. He placed in his waistband a gun that was in his truck, stating that, as a bank robber, he "had to have a gun." Once inside the bank, appellant told employees that he had the license-plate numbers from their cars and knew where they lived. Although he claimed he never waved his gun or pointed it at anyone in the bank, Mr. Horne testified that appellant pulled up his shirt and showed him the gun.

Appellant drove home after he left the bank and walked his dogs. When he returned to his house, he began looking through the money and found a tracking device that Mr. Long had placed inside the bills at the bank. He explained that he "knew that it wasn't good for a bank robber to be standing in his house with this device," so he got back into his truck, intending to dispose of the device somewhere; however, the police located him before he was able to do so.

As part of his planning of the robbery, appellant removed the license plate and a chrome "bullybar" from his truck in an apparent attempt to disguise it. Officers found a license plate lying on a table in the back of his house, and that tag was registered to appellant's truck. The truck did not have a license plate on it when officers found appellant. Along with the license plate, Officer Raymond Koonce found the

bullybar, which he described as a chrome piece that goes into the receiver for a trailer. Among other things, officers found in the driver's door pocket a sunglasses case containing a green leafy substance and a smoking pipe with residue. Appellant denied that the marijuana was his, claiming that it belonged to his mother.

In light of all of this evidence, we hold that the circuit court did not abuse its discretion by finding that appellant suffered no prejudice from Dr. Bradley's testimony that he did not recall writing appellant a prescription for Deplin. Appellant simply cannot show that the jury believed he was intoxicated, much less involuntarily so, which makes the issue of whether Dr. Bradley remembered writing a prescription for that drug immaterial. Moreover, as the circuit court noted in its ruling, the jury heard appellant's wife testify that she had Dr. Bradley's prescription for Deplin filled at Walgreens on January 7, 2010, and that appellant had brought the prescription home with him after seeing Dr. Bradley the previous day. The jury heard the very testimony whose alleged omission appellant now contends prejudiced him.

In addition, the detail with which appellant planned, executed, and attempted to cover up the robbery could provide the jury a basis for rejecting outright his claim of intoxication. Of the four medical experts who testified at trial, only Dr. Gale opined that appellant was involuntarily intoxicated due to the drugs he was taking. While Dr. Doguet diagnosed appellant as being intoxicated from Zoloft and Adderall, she also stated that his actions showed that he understood the criminality of his conduct and could have conformed his conduct to the requirements of the law. Drs. Bradley and Light completely rejected the idea that appellant was intoxicated from his medications.

Appellant's reliance on *Bennett v. State,* 307 Ark. 400, 821 S.W.2d 13 (1991), for the proposition that a new trial should have been granted, is misplaced. There, the supreme court held that a new trial should have been granted because a witness committed perjury with regard to a material issue. *Id.* Here, appellant has not shown that Dr. Bradley committed perjury by testifying that he *did not recall* writing a prescription for Deplin on January 6, 2010, in contrast to *Bennett,* where a witness deliberately lied about the nature of her relationship with the defendant.

Appellant's trial attorney acknowledged at the hearing on the motion for a new trial that he knew for more than a month prior to the trial date that Dr. Bradley would testify as a rebuttal witness for the State and that he had received Dr. Bradley's records concerning appellant a month before trial. Counsel did not interview Dr. Bradley before trial to determine the anticipated testimony. If he had, and Dr. Bradley had stated he did not recall writing a prescription for Deplin, appellant or his wife could have told counsel about the prescription well before the trial began. It was appellant and his wife, not the prosecutor, who knew whether Dr. Bradley had written a prescription. Appellant's lack of diligence is an additional reason to deny a new trial. *Clark v. State,* 358 Ark. 469, 192 S.W.3d 248 (2004).

In sum, appellant has not shown that the jury accepted his defense of intoxication, much less that the jury would have found he was involuntarily intoxicated or that Dr. Bradley's testimony about the prescription had any effect on that determination. The jury heard from appellant's wife that Dr. Bradley had written a prescription for Deplin, so he cannot show prejudice resulting from Dr. Bradley's mistaken testimony. Moreover, appellant was not diligent with regard to the issue because he failed

to interview Dr. Bradley prior to trial. Finally, but not insignificantly, the jury also heard about the financial difficulties appellant had experienced prior to the robbery, along with the detail with which appellant planned, executed, and attempted to cover up the robbery. Accordingly, we affirm with respect to this issue as well.

Affirmed.

MARTIN, J., agrees.

PITTMAN, J., concurs.